Charles Payne, T. MAYFIELD, Paul Wilson, R.H. Siegfried, Inc., Ernest E. Allerkamp, M. Sumners, & Morris Mayfield, Appellants,

v.

Rosa Vela de BENAVIDES, et al., Appellees.

No. 04–83–00369–CV.

Court of Appeals of Texas, San Antonio.

March 13, 1985.

Rehearing Denied April 10, 1985.

Thomas R. Stevens, San Antonio, Shirley A. Hale, Mann, Freed, Trevino & Hall, Laredo, R.F. Hamilton, Tulsa, for appellants.

Lawrence A. Mann, Mann, Dickinson & Saldona, Laredo, for appellees.

Before CADENA, C.J., and REEVES and TIJERINA, JJ.

## OPINION

REEVES, Justice.

This appeal involves the construction of an oil and gas lease, exploration and development damages flowing from a trespass on unleased land, and exemplary damages.

The appellants in this cause are Charles Payne, T. Mayfield, Paul Wilson, R.H. Siegfried, Inc., Ernest E. Allercamp, M. Sumners and Morris Mayfield.

The appellees in this cause are Rosa Vela de Benavides, Carlos Y. Benavides, Alfonso N. Benavides, Arturo T. Benavides, Beatriz S. Benavides, Individually and as Independent Executrix of the Estate of Roberto M. Benavides, Carlos Y. Benavides, Jr., Trustee, and Arturo N. Benavides, Trustee.

Chronologically, the events leading to this suit are as follows:

On March 30, 1968, appellees entered into a lease of 2936.9 acres with Mobil Oil Corporation. This lease was known as the "Benavides 'B' lease"; it had a primary term of five years and would be perpetuated "so long thereafter as oil, gas or other mineral is produced."

In July, 1968, Mobil made a partial assignment of the lease down to depths of 4,200 feet to Ralph Rowden, Ernest A.

Allerkamp and the Texas-Wisconsin Oil Company.

On January 21, 1972, drilling of a well, designated as the "B–1" was commenced; it was completed as a gas well on February 10, 1972, prior to the expiration of the five-year primary term.

On January 24, 1972, Ralph Rowden, Ernest E. Allerkamp and the Texas-Wisconsin Oil Company assigned to appellants mineral rights down to 2,000 feet in and under 320 acres around the B–1 well. On the same date by separate assignment, the parties effected an assignment of an additional 326.9 acres noncontiguous to the 320 acres surrounding the B–1 well. This latter assignment included 126.9 acres in Section 22 on which the appellants later drilled a well which was designated the "C–1." The 126.9 acre tract is located several miles from the 320 acre tract on which the B–1 well is located. Between the two tracts is a 1,400 acre tract in which the appellants have an interest under a 1966 lease. The parties refer to the lease for the 1,400 acres as the "Benavides 'A' lease." The rights under this lease are not involved in this controversy.

On March 30, 1973, the primary term of the March 30, 1968 lease expired.

In 1977, appellants drilled and operated a gas well, the "C–1" well, on the 126.9 acres they claim was perpetuated under the March 30, 1968 lease by production of the "B–1" well.

Production of the B–1 well perpetuated the lease as to some acreage. Precisely which acreage was held under the lease by the B–1 production constitutes the central controversy between the parties.

Appellees brought a suit to quiet title and for an accounting of gas produced from the C–1 well. Trial was to the court without a jury. The trial court found that the lease had terminated as to the 126.9 acres on which the C–1 well was located. Appellees were awarded actual and exemplary damages; appellants were denied recovery of their drilling and operating expenses.

Appellants assert four points of error:

(1) The trial court erred in holding that appellants cannot claim, under paragraph 12 of the March 30, 1968 oil and gas lease, acreage upon which the C–1 well is located.

(2) The trial court erred in finding that appellants were not good faith trespassers when appellants drilled the C–1 well because there is insufficient evidence to support lack of good faith.

(3) The trial court erred in denying appellants the right to recoup and recover their drilling, equipping, completing and operating costs and expenses.

(4) The trial court erroneously awarded exemplary damages to appellees.

INTERPRETATION OF THE LEASE

Paragraph 12 of the March 30, 1968 lease reads as follows:

12. It is agreed that, notwithstanding anything herein contained to the contrary, at the expiration of the primary term hereof this lease shall terminate insofar as it covers all of the above-described land except such land as may be allocated to a well for production purposes; the maximum amount of land to be allocated to an oil well shall not exceed eighty (80) acres plus a tolerance of ten per cent (10%) thereof for each oil well on the lease premises and to a gas well (whether producing or capable of producing gas in paying quantities) shall not exceed 640 acres plus a tolerance of ten per cent (10%) thereof for each gas well and provided also that if Lessee at the expiration of the primary term hereof is engaged in operations for drilling or re-working a well on land covered hereby or on land pooled therewith, this lease shall remain in full force and effect as to all of the land covered hereby so long as such operations are conducted on that well or successive wells with no cessation of more than ninety (90) days between the completion or abandonment of one well and the commencement of drilling or re-working operations on the succeeding well and, upon the cessation of such op-

erations for more than ninety (90) days, this lease shall terminate insofar as it covers all of the above described land except as to the land allocated to a well or wells for production purposes with the production determining the number of acres to be maintained or extended by such well.

Appellants claim that under paragraph 12 of the March 30, 1968 lease, the lease could be perpetuated for a maximum of 640 acres. They first claim the 320 acres around the B–1 well; appellees as plaintiffs below took a non-suit as to this acreage. However, appellants maintain that the remainder of the 640 acres specified in paragraph 12 can be claimed on land noncontiguous to the B–1 well. Thus, they claim the B–1 well production perpetuated the March 30, 1968 lease as to the 126.9 acres on which the C–1 well is located.

Under the appellees' interpretation of paragraph 12, the lease terminated on March 30, 1973 except as to the land allocated to production of the B–1 well, a total of 320 acres.

■■■ Interpretation of a written instrument is always a quest for the intention of the parties to it. *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex.1966). However, language used by the parties should be given its plain grammatical meaning unless to do so would definitely defeat the intention of the parties. *Id.* at 92. The intention of the parties, as that intention is expressed in the lease, is to be ascertained by considering all of the lease provisions. *McMahon v. Christmann*, 157 Tex. 403, 303 S.W.2d 341, 344 (1957). The intention of the parties is not to be gathered from isolated parts of the instrument but from the four corners of the document. *Shown v. Getty Oil Co.*, 645 S.W.2d 555, 559 (Tex.App.—San Antonio 1982, writ ref'd). The plain language of the lease must be given an operative effect in harmony with its plain import. *Superior Oil Co. v. Dabney*, 147 Tex. 51, 211 S.W.2d 563, 565 (1948).

The language of paragraph 12 is clear that 640 acres may be allocated to a gas well. Appellants seize upon this portion of the paragraph to claim acreage not surrounding the B–1 well but lying several miles away. They dismiss as immaterial the fact that the acreage is noncontiguous.

However, such an interpretation runs counter to the rules of interpretation elucidated above. The instrument must be interpreted as a whole. Paragraph 12, a special limitation, provides at the conclusion of the primary term, the lease shall terminate except as to "such land as may be allocated to a well for production purposes." The language that follows this clause sets out a maximum amount of land that can be allocated to an oil or gas well. Land allocated to a gas well "shall not exceed 640 acres plus a tolerance of ten per cent (10%)." The 640 acres, then, is merely a maximum allowable.

Paragraph 12 was not designed to allow a lessee to pick and choose acreage that can be held under a lease after expiration of the primary term. Under appellants' interpretation of paragraph 12, the lessee could select any number of small units of acreage, in checkerboard fashion, throughout the entire leasehold. The lessee could thereby acquire future drilling rights past the original term for an indefinite period of time. This surely could not be the intent of the parties.

The acreage which is to be held under a lease that has expired because of the presence of a producing well is held solely for production purposes relating to that particular well. This is clear from the concluding statement of paragraph 12: "... this lease shall terminate insofar as it covers all of the above described land except as to the land allocated to a well or wells for production purposes with the production determining the number of acres to be maintained or extended by such well."

■■ We hold that the trial court correctly found that the March 30, 1968 lease was not perpetuated by production of the B–1 well so as to hold acreage on which the C–1 well is located. Point of error number one is overruled.

**504**

## THE ISSUE OF GOOD FAITH

■ Appellant complains of the sufficiency of the evidence to support a finding that they were bad faith trespassers. In passing upon the factual sufficiency of the evidence to set aside the decision of the fact finder, we weigh all of the evidence presented. We will reverse and remand the cause for a new trial only if we find the decision of the fact finder to be so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 662 (1952).

■ To be in good faith in developing a tract of land for oil or gas, one must have both an honest and a reasonable belief in the superiority of one's title. *Gulf Production Co. v. Spear*, 125 Tex. 530, 84 S.W.2d 452, 457 (1935). "Good faith under one state of facts would not be good faith under a slightly different state of facts." *Id.*, 84 S.W.2d at 457.

The essential facts developed at trial in this cause were as follows:

1. Throughout 1973 and 1974, the parties disputed what acreage was held under the terms of the expired Benavides "B" lease. Appellants informed appellees that they had picked 320 acres around the B-1 well and 320 acres in separate tracts for future exploration. In late 1974, counsel for the appellees told appellants that appellees did not consider the March 30, 1968 lease to be in force and effect except for a maximum of 320 acres surrounding the B-1 well.

2. In spite of their claim to a leasehold interest in the 126.9 acres upon which the C-1 well is located, appellants attempted to secure a new lease covering the same acreage as well as additional tracts of land. Negotiations failed and appellee Arturo Benavides told appellant Payne, "Charles, we're too far apart." Consequently, no new lease was effected between the parties as to the tract of land upon which the C-1 well was drilled.

3. In December, 1976, appellants staked the C-1 well location. The well location plat depicting section number 22 is designated "Mayfield Engineering Service 'C' Lease—150.4 acres." There was no "C" lease, however, and the Benavides "B" lease, when in force during the primary term, covered only 126.9 acres of section 22 in which the C-1 well is located, not 150.4. Thus, the plat designation was in error.

4. In applications to drill the C-1 well which were filed with the Texas Railroad Commission in 1977, appellant Mayfield certified that the proposed C-1 well was to be on the "Rosa V. Benavides 'C' lease" covering 307.30 acres and added the explanatory note, "This location on 150.4 acre tract of 307.30 acre lease—acreage is non-contiguous." As noted above, there was no "C" lease and the "B" lease never covered 150.4 acres of section 22.

Thus, the above undisputed evidence was presented to the trial court and supports a finding of bad faith. The appellants were aware of appellee's consistent contention, communicated by counsel for the appellees, that the acreage where the C-1 well was drilled was not perpetuated under the March 30, 1968 lease. The appellants, in apparent conflict with their claim to a lease on the acreage by virtue of the March 30, 1968 lease, attempted to secure a new lease to the disputed land. Most significant is the fact that appellants represented to the Railroad Commission that a "Rosa Benavides 'C' Lease" existed.

Appellants direct our attention to other facts which they contend demonstrate good faith. They emphasize that they believed they had a good claim and the right to drill the C-1 well. They also point to the fact that there was no pending litigation concerning the oil and gas interests at the time they entered to drill the C-1 well.

■ When one enters into possession of land and makes improvements thereon with full knowledge of the pendency of an action to enforce an adverse claim to the premises, one is conclusively considered a trespasser in bad faith. *Houston Production Co. v. Mecom Oil Co.*, 62 S.W.2d 75 (Tex.Comm'n App.1933). The converse of the *Mecom* rule is not true, however; mere-

ly because a suit has not been filed, the entry is not automatically one done in good faith. Rather, it is a circumstance to be considered along with other factors in determining the good faith of the trespasser. *See* Note, *Oil and Gas Right of Trespasser to Compensation for Improvements— What Constitutes "Good Faith,"* 12 TEXAS L.REV. 210 (1934).

It is noteworthy that while no suit had been filed when the C–1 well was drilled in 1977, appellants were fully aware of appellees' adverse claim to the acreage. A letter from appellees' counsel in late 1974 stated, "We continue to feel that the extent of the perpetuated rights ... are governed by the terms of the respective leases and we find no basis for belief that the B–1 well can hold up to 640 acres in view of the fact that no more than 320 acres have apparently ever been dedicated to production from the well."

■ Acting with notice of an adverse claim does not prohibit a finding of good faith. *Louder v. Schluter,* 78 Tex. 103, 14 S.W. 205 (1890) (reversing lower court's denial of cost of improvements), 78 Tex. 103, 13 S.W. 207 (1890) (reversing prior opinion on motion for rehearing because of no evidence). However, it is an additional consideration for the court in viewing the totality of circumstances.

Appellants argue that they were in good faith because of certain other factors which weigh against a finding of bad faith: (1) drainage was taking place in the field, (2) they relied upon advice of counsel as to the interpretation of paragraph 12 of the March 30, 1968 lease, (3) appellees accepted royalties from the C–1 well production, (4) appellees knew or should have known of their adverse claim before appellants entered and drilled.

It is a disputed fact as to when appellees learned of the C–1 well. Appellant Payne testified that he mentioned to Arturo Benavides the drilling of the C–1 well only after operations had begun. However, Payne testified that appellee Arturo Benavides "knew or should have known" about the

drilling because the well location was near Arturo Benavide's ranch house.

Arturo Benavides denied any conversations with Payne concerning the C–1 well. He testified that he discovered the existence of the C–1 well operation by chance in October or November of 1978 when he encountered an employee of Mayfield Engineering checking a gauge to a well at a location too far removed from the Benavides "A" lease or "B" lease to be attributable to them.

Appellees admit they accepted royalties from the C–1 well production for over a year. However, they claim they were unaware that the royalty checks they received covered more than the production from the wells on the "A" lease and the well on the "B" lease. Only one of the sixty-five checks admitted into evidence made reference to the C–1 lease. It was dated December 16, 1977, payable in the amount of $716.48 to Rosa Vela de Benavides. Rosa Vela de Benavides was approximately ninety years old when she received the check. The check contains a notation on its face: "Benavides leases—R.I.; November Sales; Benavides "C"—$103.46." None of the other four checks issued to other royalty interest owners on that same date made reference to the "C" lease.

Accompanying the royalty checks were reports which appellants allege contained breakdown of production from the wells. Arturo Benavides testified that he never looked at these reports, however, and merely filed them upon receipt. There is no evidence of the contents of these reports.

Regarding reliance upon counsel, appellant Payne testified that he consulted with his personal attorney in Tulsa who advised him that under paragraph 12 of the March 30, 1968 lease, appellants could claim up to 640 acres on noncontiguous acreage. Payne also testified he received similar opinions from "two or three different people." None of these individuals were named, none testified at trial, nor was any written correspondence or document reflecting such legal opinions introduced into evidence. The trial court had before it,

then, only Payne's bare assertion that appellants relied upon the advice of counsel.

 Appellant's expert witness testified that drainage had occurred by other operators producing on land adjoining the disputed acreage. If drainage is occurring, it is reasonable an operator would act to protect leasehold interests as well as the interest of the owners. The test as to when an operator should drill offset wells when drainage is taking place is what a reasonably prudent operator would do under similar facts and circumstances. *Chapman v. Sohio Petroleum Co.*, 297 S.W.2d 885 (Tex.Civ.App.—El Paso 1956, writ ref'd n.r.e.). However, if the operator has no leasehold interest, or unreasonably believes a leasehold interest exists, drainage in no way excuses a trespass upon the property of another.

Here the trial court found that under the only reasonable interpretation of paragraph 12, appellant drilled the C–1 well without an interest in the acreage upon which it was located.

 Considering all factors, we hold that the trial court did not err in finding the appellants to be in bad faith as there is sufficient evidence to support such a determination and such is not against the great weight and preponderance of the evidence.

### RECOVERY OF DRILLING AND OPERATING COSTS

 As the trial court found appellants to be bad faith trespassers, recovery of development costs was correctly denied. The recovery of drilling and operating costs is predicated on the trespassers showing the trespass was unintentional or committed under a good faith belief as to the superiority of the trespasser's claim. *See Bender v. Brooks*, 103 Tex. 329, 127 S.W. 168 (1910).

 When the trespass is done in bad faith, the measure of damages is "the value of the things mined at the time of severance without making deduction for the cost of labor and other expenses incurred in committing the wrongful act ... or for any value he may have added to the mineral by his labor." *Cage Brothers v. Whiteman*, 139 Tex. 522, 163 S.W.2d 638, 642 (1942).

Appellants' point of error number three is overruled.

### EXEMPLARY DAMAGES

The trial court found that the defendant's actions and conduct "reflected a conscious disregard for and indifference to the consequences of drilling and producing the C–1 well without the consent of the plaintiffs." There is evidence to support this finding. Moreover, appellants were found to have been in bad faith.

 Appellants argue that exemplary damages are not appropriate in this cause; they attempt to distinguish *Scurlock Oil Co. v. Joffrion*, 390 S.W.2d 526 (Tex.Civ.App.—Tyler 1965, no writ), a case where exemplary damages were awarded, in that it was a surface trespass case. We find this distinction to be without merit. *See Houston Production Co. v. Mecom, supra* at 77. A conscious indifference to and disregard of the rights of others, whether displayed while committing a surface trespass or a subsurface trespass, displayed by one who trespasses in bad faith, is sufficient to support an award for exemplary damages. *Trenholm v. Ratcliff*, 646 S.W.2d 927 (Tex.1983).

The judgment of the trial court is affirmed.