In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-01-00157-CV


______________________________




IN THE MATTER


OF


C.S.H., A MINOR





 


On Appeal from the District Court Sitting as a Juvenile Court


Titus County, Texas


Trial Court No. 524




 




Before Morriss, C.J., Grant and Ross, JJ.


Opinion by Justice Grant



O P I N I O N



 C.S.H. appeals the trial court's order modifying his juvenile disposition and committing him
to the Texas Youth Commission (TYC). On October 31, 2000, the trial court found C.S.H. engaged
in delinquent conduct under Tex. Fam. Code Ann. § 51.03(a)(1) (Vernon 2002) by committing
burglary of a building, two misdemeanor theft offenses, and misdemeanor criminal mischief. See
Tex. Pen. Code Ann. §§ 28.03(b)(2), 30.02(c)(1), 31.03(e)(2)(A)(I) (Vernon Supp. 2003). The trial
court adjudicated C.S.H. delinquent and placed him on two years' probation. Among the
requirements of his probation, C.S.H. was ordered to "commit no offense against the laws of this or
any other State, or of the United States." 

 About a year later, the State moved to modify C.S.H.'s disposition, alleging he violated the
requirements of his probation by intentionally or knowingly causing serious bodily injury to
Christopher Levi Bevington by severely breaking his arm. See Tex. Pen. Code Ann. § 22.02(a)(1)
(Vernon 1994) (aggravated assault). After a hearing, the trial court found C.S.H. engaged in
delinquent conduct, modified his disposition, and committed him to TYC.

 C.S.H. contends there is factually insufficient evidence that he intentionally or knowingly
caused serious bodily injury to Bevington. At the hearing, Bevington testified as follows. He and
C.S.H. rode the same bus to and from school. On the day of the alleged assault, he and C.S.H.
became involved in a physical confrontation on the bus on the way home from school. C.S.H.
slapped Bevington on the cheek, and Bevington told him something to the effect of, "I swear to all
the angels in heaven if you ever do that again I will . . . kick [your] ass." C.S.H. then pinched him
in the face, and the two began to scuffle. 

 Bevington further testified that the bus driver ordered him to sit at the front of the bus and
C.S.H. to sit in the middle. C.S.H.'s stop was immediately before Bevington's, but the two stops
were separated by about one hundred feet. Just before C.S.H.'s stop, Bevington obtained the bus
driver's permission to retrieve his bag, which was at the back of the bus. As he walked past C.S.H.,
he heard C.S.H. say, "We are going to finish this." Other students asked him whether he was going
to fight C.S.H., and he responded, "If I have to I will go ahead and do it." 

 C.S.H. exited the bus at his regular stop, but he immediately began walking toward
Bevington's stop. Bevington exited the bus at his regular stop and walked about five or ten feet to
meet C.S.H. The two faced each other, and C.S.H. told Bevington he was not going to do anything
until the bus drove off. Eventually, Bevington turned to walk away. 

 As he was walking away, C.S.H. "grabbed [Bevington's] left arm and twisted it behind
[Bevington's] back." Bevington described the remainder of the altercation as follows:

 Q Why don't you stand up and show the judge how it happened?


 A Okay. He -- I will use the arm, he twisted it like that and back with
his other arm, he had his other arm up against my shoulder and like that he was going
to try to push me back and he was trying to trip me and make me fall backward.

 And I was able to push forward where I would get loose from him and
his other arm got loose, was right across my shoulder and I was able to -- he had his
other arm around behind me so I was trying to get behind him so I might be able to
hold onto him and maybe calm him down with that spare arm I'm pretty sure that he
would hold my arm because there wasn't anything else that he could have kept it
with.


 Q Did he still have hold of your left arm at that time?


 A Yes. He still has my left arm twisted.

 Right after that I heard a real loud crack sound and my arm throbbed
in loss [sic] of pain. I was pretty sure it was broken.

 After that he just let my arm drop and just hang there. It wasn't
working at all.


 Q Did he say anything to you at that time?


 A Yes. Right afterward he said, "How does that feel, bitch?"


 Q Okay.


 A After that I was able to get behind him, my arm was still just dangling,
I got one blow like into it but after that I tripped him and when he fell to the ground
he grabbed my shirt and pulled me with him and I landed on my right arm so I know
I didn't break my arm when I landed on the ground.

 And when we was [sic] on the ground he got up before I did and he
put my other arm in a twist, too, like he was going to try to break it, my other arm,
just twisted it like that, put it right toward his stomach area, I saw that his body was --
I saw his head was right there and I thought I would take a chance and I kneed him
in the face, after that he used his left arm and pulled me and hit me in the face and
ended up butting me and hit both of my wrists and made them pretty puffed up.


Bevington sustained breaks to both bones in his left arm and had to have two surgeries to set the
bones. He later testified C.S.H. may have used his elbow to break his arm. 

 Keith Beason, who witnessed these events, testified that on the school bus, C.S.H. "tapped"
Bevington on the face, the two stood nose-to-nose, Bevington warned C.S.H. not to do it again,
C.S.H. "tapped him on the face again," the two began to scuffle, and the bus driver ordered the two
separated. Beason testified he went to the front of the bus to throw away some trash, and Bevington
told him "he was still mad about the whole situation and if he -- if they got in another fight he didn't
want me to break it up." He testified he told C.S.H. about Bevington's comments. 

 Beason testified that when C.S.H. exited the school bus, he immediately began walking
toward Bevington's stop. When Bevington exited the bus, he walked toward C.S.H., meeting him
almost halfway. He testified, however, that he did not see who threw the first punch and did not see
how Bevington's arm was broken. 

 C.S.H. testified he thought he and Bevington were "playing" on the bus when he "tapped"
Bevington on the face. However, Bevington became angry and told C.S.H. that if C.S.H ever
touched him again, he would kill C.S.H. 

 C.S.H. testified that after the bus driver separated them, Beason told him that "[Bevington]
wanted to make it even and if [Bevington] got into a fight [Bevington] didn't want anybody to break
it up." Beason also told him, "[A] couple of times [Bevington] had got mad about something and
pulled a knife on a boy and threatened to kill him." 

 C.S.H. testified he was puzzled about why Bevington was still mad, so when he exited the
bus, he walked toward Bevington's bus stop to "talk some sense into him." Bevington met him about
halfway, "got nose-to-nose" with him, and said "he was going to whip my butt." He testified it was
Bevington who made the first move. 

 [H]e had put his arm around, threw me, he hit me right here with the ring and I
fought my way back up and he grabbed hold of my face and I was right here and he
had my head like this and pushed my arm then he grabbed hold of my legs going to
bring me down like a football tackle and my -- he twisted me around like this, he
twisted my face down with his arm under him and I landed on top of him and I heard
something snap and I looked around, it wasn't no limbs or tree or anything, I knew
that he was going - that something had broke.


He testified he did not intend to break Bevington's arm. He testified that after Bevington's arm was
broken, the two went their separate ways. 

 When considering a factual sufficiency challenge, we must consider and weigh all of the
evidence, not just that evidence supporting the verdict. Mar. Overseas Corp. v. Ellis, 971 S.W.2d
402, 407 (Tex. 1998). We may set aside the verdict only if it is so contrary to the overwhelming
weight of the evidence that it is clearly wrong and unjust. Id. We are not a fact-finder. Id. 
Accordingly, we may not pass on the witnesses' credibility or substitute our judgment for the fact-finder's, even if the evidence would clearly support a different result. Id.

 C.S.H. contends Bevington's version of the events is implausible because, according to
Bevington, he was able to get free from C.S.H., move behind him, hit him, and trip him, all after
having his arm broken in two places and rendered useless. He also observes the State failed to offer
medical testimony to show whether the breaks were caused by Bevington's arm being twisted, by
having an elbow forced against it, or by being injured in a fall. He contends a more plausible version
of the events is that Bevington's arm was broken when the two young men fell to the ground. At
most, C.S.H. contends the evidence shows he acted recklessly, but the State did not allege
recklessness as a culpable mental state.

 Aggravated assault is a result-of-conduct offense. Mendenhall v. State, 15 S.W.3d 560, 567
(Tex. App.-Waco 2000), aff'd on other grounds, 77 S.W.3d 815 (Tex. Crim. App. 2002); Brooks
v. State, 967 S.W.2d 946, 950 (Tex. App.-Austin 1998, no pet.). A person acts intentionally, or with
intent, with respect to a result of his or her conduct when it is his or her conscious objective or desire
to cause the result. Tex. Pen. Code Ann. § 6.03(a) (Vernon 1994). A person acts knowingly, or
with knowledge, with respect to a result of his or her conduct when the person is aware his or her
conduct is reasonably certain to cause the result. Tex. Pen. Code Ann. § 6.03(b) (Vernon 1994).

 There was evidence C.S.H. twisted Bevington's arm until it broke and then taunted him about
his injury. Bevington also suggested C.S.H. used his elbow to break his arm. From this testimony,
the trial court could have concluded by a preponderance of the evidence that it was C.S.H.'s
conscious objective or desire to break Bevington's arm or that C.S.H. was aware his actions were
reasonably certain to cause that result.

 The verdict in this case revolved around the weight and credibility given to the witnesses'
testimony. Because the only testimony regarding how Bevington's arm was broken came from
Bevington and C.S.H., the trial court was faced with a decision about whom to believe. C.S.H.
contends that the failure of the State to put on medical evidence about the injury demonstrates a
weakness in the State's case. Either side could have offered such evidence. We do not find the State
failed in its burden of proof by not presenting medical evidence.

 The trial court watched Bevington demonstrate how he was injured. It also heard him testify
about where his arm was broken. As fact-finder, the trial court had sufficient evidence to find that
C.S.H. engaged in delinquent conduct by breaking Bevington's arm. Based on the record before us,
we cannot say the verdict is so against the overwhelming weight of the evidence as to be clearly
wrong or unjust.

 The judgment is affirmed.



 Ben Z. Grant

 Justice


Date Submitted: September 13, 2002

Date Decided: December 10, 2002


Do Not Publish



herewith, if compliance is prevented by, or if such failure is the result of, any such Law, Order, Rule
or Regulation." As such, the lease requires compliance to be "prevented by" or "the result of, any
such Law, Order, Rule or Regulation." If the regulation is within the control of the lessee,
compliance is not prevented or the result of the regulation. Here, the requirement that Moore post
security did not compel the termination of production, but imposed conditions for all producers to
comply with in order to continue production. 

 When construing a lease similar to the lease in this case, the Corpus Christi Court of Appeals
reached a similar conclusion. See Albrecht, 878 S.W.2d 236. Similar to this lease, the lease did not
contain the phrase "beyond the reasonable control of the lessee." See id. at 242. Because the
operator had failed to comply with its regulations, the Railroad Commission ordered a well shut-in. 
Id. at 236. The court held the force-majeure clause was not triggered because the compliance was
within the reasonable control of the lessee. Id. 

 When construing a force-majeure clause identical to the clause in this case, the Tenth Circuit
has concluded the "governmental regulation at issue must preclude a lessee from performing the
sought-after relief." Watts v. Atl. Richfield Co., 115 F.3d 785, 796 (10th Cir. 1997). The court
reasoned that "[m]ere compliance with a governmental regulation" would not satisfy the force-majeure clause. Id. Because the lessee could have complied with the regulation at issue and still
have protected the unit from drainage, the court held the force-majeure clause did not protect the
lessee. Id. 

 Jet Stream introduced summary judgment evidence that other producers in the area were able
to comply with the financial assurance regulation. In his summary judgment affidavit, William L.
Rudd, III, states he was able to comply with the financial assurance regulation and "[o]ther operators
of the size of T&M Production were able to obtain financial assurance without a problem." Once
the movant establishes that it is entitled to summary judgment, the burden shifts to the nonmovant
to show why summary judgment should not be granted. Casso v. Brand, 776 S.W.2d 551, 556 (Tex.
1989). In his summary judgment affidavit, Moore states he requested a hearing in 2002 "because
bonds were for all practical purposes not available." Even if this is some evidence that bonds were
not available in 2002, this statement is not evidence that bonds were unavailable in 2004. Further,
the financial assurance was not required to be a bond. Ultimately, Moore obtained a letter of credit
from a bank rather than obtaining a bond. The statement does not indicate whether forms of
financial assurance, other than bonds, were available. Moore also introduced numerous articles from
The American Oil & Gas Reporter. Moore claims these articles create a fact issue. While the
articles discuss that many small operators were unable to comply with the financial assurance
requirements, the articles also state that some operators were able to comply with the regulations. 
Thus, Moore's own summary judgment evidence establishes at least some forms of financial
assurance were available. The summary judgment evidence conclusively established forms of
financial assurance were available. 

 As noted by the Fifth Circuit: "[i]f a contractor were able to escape his responsibilities
merely by causing an excusing event to occur, he would have no effective 'obligation to perform.'" 
Nissho-Iwai Co. v. Occidental Crude Sales, Inc., 729 F.2d 1530, 1540 (5th Cir. 1984) (whether
force-majeure clause in contract to deliver oil applied due to restrictions imposed by Libya). 
Because the evidence conclusively established forms of financial assurance were available, the Texas
Railroad Commission's regulation requiring financial assurance did not preclude compliance with
the lease. Similar to Watts, the regulation was not a force-majeure event. The trial court did not err
in granting Jet Stream's motion for partial summary judgment on this issue.

II. Due Diligence Was Not an Issue Under the Force-Majeure Clause

 Moore argues there is a fact issue concerning whether he was diligent in obtaining the
financial assurance requirements. (3) While due diligence is required for certain provisions of oil and
gas leases such as the implied covenant of reasonable development, due diligence is not an issue
when deciding whether a force-majeure clause applies. Unless the lease provides otherwise, Texas
law is well established that due diligence is not required under force-majeure clauses. See Holt, 984
S.W.2d at 283. Further, Moore did not argue there was a fact issue on diligence to the trial court. 
In his motion for summary judgment, Moore argued there were no genuine issues of material fact
concerning the force-majeure clause. This issue is not preserved for appellate review. See Tex. R.
App. P. 33.1. We overrule Moore's second point.

III. Production on the N.B. Perry Survey Did Not Hold the Lease

 Moore claims, in his third point of error, that there was production on the 1533.27 acres
originally leased under the 1943 lease. The evidence conclusively established that at least one well
was producing in the N.B. Perry Survey. The entire N.B. Perry Survey was among the property
included in the original 1533.27 acres covered by the lease. However, Rudd testified these wells
were released in 1954 from the 1943 lease. (4) For the sake of convenience, we will refer to the land
released from the 1943 lease as the Perry Tract and refer to the remainder of the land under the 1943
lease as the Rudd Tract.

 Moore claims that the production on the Perry Tract prevented the lease from terminating. 
The Texas Supreme Court has disagreed. In Ridge Oil, the Texas Supreme Court held that
production on the Ridge Tract did not hold the lease on the Guinn Tract after the lease had
terminated as to the Ridge Tract. Ridge Oil Co. v. Guinn Invs., Inc., 148 S.W.3d 143, 153 (Tex.
2004). Both tracts had previously been covered by the same 1937 lease. Id. However, when the
parties executed a new lease for the Ridge tract, the 1937 lease effectively terminated for the Ridge
Tract. Id. After the lease terminated, the Texas Supreme Court held the production on the Ridge
Tract no longer held the lease for the Guinn Tract. Similarly, the release of the Perry Tract from the
lease terminated the lease as to the Perry Tract. As such, production on the Perry Tract did not hold
the lease as to the Rudd Tract. 

 Moore argues that the language of the lease requires all production to cease on all the
property originally leased in 1943. In essence, Moore argues the fact that some of the acreage had
been released from the lease is irrelevant. Moore directs us to two provisions in the lease:

 2. Subject to the other provisions herein contained, this lease shall be for a
term of Five years, from this date (called "primary term") and as long thereafter as
oil, gas or other mineral is produced from said land or land which said land is pooled
hereunder.


 . . . .


 8. The rights of either party hereunder may be assigned in whole or in part,
and the provisions hereof shall extend to the heirs, successors and assigns of the
parties hereto, but no change or division in ownership of the land, rental or royalties
however accomplished shall operate to enlarge the obligations or diminish the rights
of lessee; and no such change in ownership shall be binding on lessee nor impair the
effectiveness of any payments made hereunder until lessee shall have been furnished,
forty-five (45) days before payment is due, a certified copy recorded instrument
evidencing any transfer, inheritance, sale, or other change in ownership. In the event
of assignment of this lease as to a segregated portion of said land, the rentals payable
hereunder shall be apportionable as between the several leasehold owners ratably
according to the surface area of each, and default in rental payment by one shall not
affect the rights of other leasehold owners, hereunder. If six or more parties other
than the original lessor become entitled to royalty hereunder, lessee may withhold
payment of royalty to such parties unless and until furnished with a recordable
instrument executed by all of such parties designating an agent to receive payment
for all.


According to Moore, the above provisions of the lease preclude the lease from terminating because
production occurred on a tract of land described in the lease even though the tract upon which
production had continued had been released from the lease. 

 Moore argues, because the lease provides "no change or division in ownership of the land,
rental or royalties however accomplished shall operate to enlarge the obligations or diminish the
rights of lessee," the release from the lease of the only producing tract is not relevant. The second
provision, contained in paragraph 8, appears to be an entirety clause. An entirety clause is intended
"to preserve the lease as an indivisible operating unit despite transfers of title by the lessor." 
4 Kuntz, The Law of Oil & Gas, § 48.2, p. 144 (1990); 4-6 Williams & Meyers, Oil & Gas Law
§ 678 (Lexis 2006). The clause in paragraph 8 references changes in rental payments and royalties
based on assignments or other changes in ownership. It specifically provides "rentals payable
hereunder shall be apportionable." One of the purposes of an entirety clause is to relieve the parties
of the obligations of the nonapportionment rule. 4 Kuntz, The Law of Oil & Gas, § 48.2, p. 144. 
The nonapportionment rule provides that royalty payments will only be paid to the extent of the
lessor's interest in the tract where the well is located. Id. at p. 145. The nonapportionment rule may
cause a lessor to duplicate equipment and require a lessor to protect against internal drainage, i.e.,
drainage from another subdivided portion of the same leased premises. Id. at pp. 144-46. 

 Paragraph 8 only prohibits changes in ownership under the lease from enlarging the
obligations or diminishing the rights of the lessee; it does not apply to tracts of land which have been
released from the lease. Moore ignores the beginning phrase of the paragraph which provides "[t]he
rights of either party hereunder." The use of the word "hereunder" implies the clause only applies
to tracts of land to which the lease applies. The rest of the paragraph indicates such a conclusion was
the intent of the parties. The rest of the paragraph contains the following phrases: "payments made
hereunder," "assignment of this lease," and "other leasehold owners hereunder." We conclude the
intent of the parties was for the paragraph to only apply to tracts of land still bound by the lease. 
Therefore, the prohibition in paragraph 8 does not apply to changes of ownership of tracts which
have been released from the lease. 

 The first provision, contained in paragraph 2 of the lease, merely references the land without
any qualification for whether the acreage had been released from the lease. Thus, Moore argues
production on land described in the lease will hold the lease regardless of whether the lease still
applies to the property. The lessor is permitted, under the lease, to release tracts of land from the
lease. The lease provides:

 4. . . . Lessee, or any assignee hereunder, may at any time execute and deliver
to lessor, or to the depository above named, or place of record, a release or releases
covering any portion or portions of the premises held by him, and thereby surrender
this lease as to such portion or portions, and thereafter the rentals payable by him
shall be reduced proportionately.


When construing a lease, we must examine the entire lease and attempt to harmonize all its
provisions. Anadarko Petroleum Corp. v. Thompson, 94 S.W.3d 550, 554 (Tex. 2002); Coker v.
Coker, 650 S.W.2d 391, 393 (Tex. 1983). When the clauses are read together, the intent of the
parties was for "said land" to refer to land subject to this lease. Because the Perry Tract was released
from the lease, it was no longer land subject to the lease. As such, the phrase "said land" does not
refer to the Perry Tract. 

 Moore cites Mathews v. Sun Oil Co. for the proposition that, when an oil and gas lease covers
land consisting of multiple tracts, production on one tract will operate to perpetuate the lease as to
all tracts. 425 S.W.2d 330, 333 (Tex. 1968). The present case, though, is distinguishable. While
the lease in dispute covers multiple tracts, the only tracts on which there was production have been
previously released from the lease. 

 In addition, Moore cites Ridge Oil Co. for the proposition that an oil and gas lease does not
terminate when there are multiple operators under a lease and there is production by only one
operator. 148 S.W.3d at 149-50. As discussed above, the Texas Supreme Court in Ridge Oil
ultimately held production on the Ridge Tract did not hold the Guinn Tract. Id. at 153. We note the
Texas Supreme Court did hold, when there are multiple operators under a lease and there is
production by only one operator, the production holds the lease. Id. However, this holding required
both the nonproducing operator and the producing operator to be assignees of the same lease. That
is not the situation we have in this case. In this case, the evidence shows the producing operator was
a lessee under a different lease. 

 Finally, Moore argues the lease has been pooled. Moore, though, has not directed this Court
to where there is evidence of pooling of the Rudd Tract. Moore argues "production from the Haddad
No. 1 Lease, which had been pooled with the acreage in the N.B. Perry Survey held his lease as
shown by the Pooling Declaration and Agreement in the record." The record citations merely show
that the Perry Tract was pooled. The fact that land which has been released from the lease has been
pooled does not hold the lease. The record does not contain any evidence that any tracts which have
not been released from the lease have been pooled with producing tracts. Moore's third point of error
is overruled.

IV. The Doctrine of Implied Temporary Cessation Does Not Apply

 In the alternative, Moore claims the implied temporary cessation doctrine precludes
termination. Under the implied temporary cessation doctrine, a temporary cessation of production
will not cause the lease to terminate and the lessee is entitled to a reasonable time in which to remedy
the defect and resume production. See Midwest Oil Corp. v. Winsauer, 159 Tex. 560, 323 S.W.2d
944, 946 (1959). The implied temporary cessation doctrine does not apply when a lease contains "a
provision in the habendum clause which expresses a time limitation within which continued drilling
or reworking operations must be conducted." Holt, 984 S.W.2d at 281-82; Samano v. Sun Oil Co.,
621 S.W.2d 580, 581-84 (Tex. 1981); Ridenour v. Herrington, 47 S.W.3d 117, 120 (Tex.
App.--Waco 2001, pet. denied).

 Because the lease at issue contained explicit language limiting the cessation of production
to a specific time period, the doctrine of implied temporary cessation does not apply.

V. Moore Is Not Entitled to Forty Acres Around Each Well

 In his fifth point of error, Moore claims he is entitled to forty acres around each of the two
wells. The lease provides:

 9. In case of cancellation or termination of this lease from any cause, Lessee
shall have the right to retain, under the terms hereof, around each well producing,
being worked on, or drilling hereunder, the number of acres in the form allocated to
each such well under spacing and proration rules issued by Texas Railroad
Commission of the State of Texas, or any other State or Federal authority having
control of such matters; or, in the absence of such rulings; forty (40) acres around
each such well in as near a square form as practicable, and in the event lessor
considers that operations are not being conducted in compliance with this contract,
lessee shall be notified in writing of the facts relied upon as constituting a breach
hereof and lessee shall have sixty (60) days after receipt of such notice to comply
with the obligations imposed by virtue of this instrument. 


Moore argues "[i]t is uncontraverted [sic] that Appellant was producing two wells on his lease at the
time Appellees gave him notice that his lease had 'expired in accordance with its terms'" and claims
he is entitled to retain forty acres around each well. 

 Moore argues, in a lease terminated due to nonproduction, there were producing wells. The
key to this argument is that Moore defines a different date of termination than Jet Stream. If the
lease terminated due to nonproduction, Moore assumes termination occurred when he received the
notice of termination. Two wells were producing at the time Moore received the notice of
termination sent by Jet Stream. Jet Stream asserts the date of termination was thirty days after the
production ceased. (5) 

 The Texas Supreme Court and this Court have both held a lease, after the primary term has
expired, automatically terminates after production is ceased. Watson v. Rochmill, 137 Tex. 565, 155
S.W.2d 783, 784 (1941) ("It appears to be very well settled that under the terms of the lease, upon
cessation of production after termination of the primary term, the lease automatically terminated.");
Fuller v. Rainbow Res., Inc., 744 S.W.2d 232, 234 (Tex. App.--Texarkana 1987, no writ); see Pool,
124 S.W.3d at 203 ("under the automatic termination rule, without a savings clause, cessation of
production in the secondary term automatically terminates the lease, even if profitable production
is later restored"); Waggoner & Zeller Oil Co. v. Deike, 508 S.W.2d 163, 166 (Tex. Civ.
App.--Austin 1974, writ ref'd n.r.e.). Production of oil or gas constitutes a special limitation on the
determinable fee transferred. Id. at 166. If drilling operations are not commenced within the
specified time, the lease automatically terminates. Id. Because there is nothing a lessee could do
to correct or begin to correct the breach of a special limitation, any notice provision does not apply. 
Id. The lease automatically terminated when production was not resumed within the specified time,
and notice of termination was not required. At the time the lease automatically terminated, there
were no producing wells. (6) As such, the clause does not apply. Moore's fifth point of error is
overruled.

VI. The Trial Court Erred In Issuing an Injunction Prohibiting Moore From Recovering
His Equipment


 In his sixth point of error, Moore argues the trial court erred in denying Moore's motion for
summary judgment seeking recovery of his equipment still on the land, including the well casings. 
Moore had brought a counterclaim seeking a declaratory judgment that he had the right to remove
his equipment, including the casings. Jet Stream failed to respond to this counterclaim in either his
motion for partial summary judgment or in the brief in support thereof. After granting Jet Stream's
motion for partial summary judgment and denying Moore's motion for summary judgment, the trial
court set the case for trial. 

 In his answer and counterclaim, Moore pled that, in the event the lease terminated, he had
"the right at any time during or after the expiration of this Lease to remove all property and fixtures
placed by lessee on said land, including the right to draw and remove all casing on the property." 
This issue was not disposed by the partial summary judgment. Although not listed among the issues
set for trial, the record indicates the trial was intended to resolve all remaining issues. (7) Moore was
afforded the opportunity to present evidence at the trial, and Jet Stream cross-examined Moore
concerning his testimony. Neither party argues the trial court's judgment was not final or complains
that this issue was not among those set for trial. The final judgment disposes of all parties and all
claims. A judgment that disposes of all parties and all claims is final and appealable. Lehmann v.
Har-Con Corp., 39 S.W.3d 191 (Tex. 2001). The trial court's judgment is a final, appealable order. 

 At the hearing, Moore testified that the value of "all the equipment and casing" for the well
sites would be approximately $100,000.00. In its final judgment, the trial court issued a permanent
injunction enjoining Moore from "taking any action to interfere with the current status of the wells
. . . including specifically taking any action to remove equipment from the wells or otherwise
changing the current status of the well pending further order of this court." 

 Jet Stream argues Moore is currently in possession of the fixtures, the issue is not ripe, and
a party cannot appeal the denial of a summary judgment. First, there is no evidence in the record
concerning who is in possession of the equipment. Second, Jet Stream fails to cite any authority for
the proposition the issue is not ripe for adjudication and as such the issue of ripeness is inadequately
briefed. See Tex. R. App. P. 38.1(h). Thus, the only argument advanced by Jet Stream that merits
attention is whether an appellant can appeal the denial of a motion for summary judgment. 

 Where a motion for summary judgment is denied by the trial court and the case is tried on
its merits, the order denying the summary judgment cannot be reviewed on appeal. Ackermann v.
Vordenbaum, 403 S.W.2d 362, 365 (Tex. 1966); Williams v. Colthurst, 253 S.W.3d 353 (Tex.
App.--Eastland 2008, no pet.); Cleaver v. Cundiff, 203 S.W.3d 373, 379 (Tex. App.--Eastland
2006, pet. denied); Anderton v. Schindler, 154 S.W.3d 928, 931 (Tex. App.--Dallas 2005, no pet.);
see Valencia v. Garza, 765 S.W.2d 893 (Tex. App.--San Antonio 1989, no writ). Because Moore
cannot appeal the denial of his summary judgment motion, we will, in the interest of justice, interpret
Moore's sixth point of error as challenging the trial court's permanent injunction.

 The lease in this case provides the "[l]essee shall have the right at any time during or after
the expiration of this lease to remove all property and fixtures placed by lessee on said land,
including the right to draw and remove all casings." An operator has an implied right to remove
leasehold equipment "within a reasonable time of the expiration of the lease, even in the absence of
a specific provision authorizing such removal." McCormick v. Krueger, 593 S.W.2d 729, 731 (Tex.
Civ. App.--Houston [1st Dist.] 1979, writ ref'd n.r.e.); cf. Exxon Corp. v. Pluff, 94 S.W.3d 22, 30
(Tex. App.--Tyler 2002, pet. denied) (no implied duty to remove equipment). Leasehold equipment
is considered personal property. See id.; Meers v. Frick-Reid Supply Corp., 127 S.W.2d 493, 496
(Tex. Civ. App.--Amarillo 1939, writ dism'd); Orfic Gasoline Prod. Co. v. Herring, 273 S.W. 944,
945 (Tex. Civ. App.--Waco 1925, no writ). We note, though, the lessee does not have the right to
remove the well casing if the well is producing or the removal would damage the well. See Patton
v. Rogers, 417 S.W.2d 470, 478 (Tex. Civ. App.--San Antonio 1967, writ ref'd n.r.e.) ("an owner
has no right to remove casing from a producing oil and gas well"); Eubank v. Twin Mountain Oil
Corp., 406 S.W.2d 789, 791 (Tex. Civ. App.--Eastland 1966, writ ref'd n.r.e.). "Where the owner
of the casing is precluded by the principle of equity . . . from removing the casings from a well
producing or capable of producing products in paying quantities, he is, nevertheless, entitled to just
compensation measured by the value of such casing in place less the cost of removing the same." 
Fike v. Riddle, 677 S.W.2d 722, 727 (Tex. App.--Tyler 1984, no writ). 

 Moore had the right to recover his equipment except the well casing. Moore was also entitled
to the value of the well casing less the cost of removal. Moore testified that the value of "all of the
equipment and casing" for the well sites would be approximately $100,000.00. This is some
evidence of the total value of all of the equipment and the well casing. However, the record contains
no evidence of the cost of removing the well casing. Because it was Moore's burden to introduce
evidence of both the value of the well casing and the cost of its removal, the trial court did not err
in failing to enter a finding of damages for the casing. Except for the well casing, the trial court
erred in enjoining Moore from removing his equipment from the lease property. 

VII. The Trial Court Erred in Awarding Gross Revenue

 In his seventh point of error, Moore argues the trial court erred when it awarded Jet Stream
damages measured by the gross revenue from oil sales after Moore resumed production in 2005. On
rehearing, Moore directs this Court to Jet Stream's request in its petition that a temporary injunction
be issued prohibiting Moore from ceasing production during the pendency of the proceedings. 
Moore argues Jet Stream should be estopped from collecting damages for bad faith trespass and
should be limited to damages for good faith trespass. (8) 

 When a producer trespasses and extracts oil, gas, or other minerals, the method by which
damages are calculated depends on whether the producer's actions are in good faith. If a producer
trespasses in good faith, the measure of damages is the value of the minerals minus drilling and
operating costs. Mayfield v. de Benavides, 693 S.W.2d 500, 506 (Tex. App.--San Antonio 1985,
writ ref'd n.r.e.); see Bender v. Brooks, 103 Tex. 329, 335, 127 S.W. 168, 171 (1910). "To be in
good faith in developing a tract of land for oil or gas, one must have both an honest and a reasonable
belief in the superiority of one's title." Mayfield, 693 S.W.2d at 504; Gulf Prod. Co. v. Spear, 125
Tex. 530, 84 S.W.2d 452, 457 (1935). The measure of damages for bad faith trespass, though, is
"'the value of the things mined at the time of severance without making deduction for the cost of
labor and other expenses incurred in committing the wrongful act . . . or for any value he may have
added to the mineral by his labor.'" Mayfield, 693 S.W.2d at 506 (quoting Cage Bros. v. Whiteman,
139 Tex. 522, 163 S.W.2d 638, 642 (1942)). The measure of damages for bad faith trespass is
intended to both compensate the owner and to punish the trespasser. 1 Kuntz, The Law of Oil &
Gas, § 11.3, p. 309 (1987).

 In our original opinion, we concluded the trial court did not err in awarding damages based
on a bad faith trespass because it was uncontested Moore extracted the oil with full knowledge of
an adverse claim. (9) After reconsideration, we conclude the facts that Jet Stream--1) affirmatively
requested production not be suspended, and 2) agreed to the temporary injunction--should estop Jet
Stream from obtaining damages based on bad faith trespass.

 Jet Stream denies, in its response to Moore's motion for rehearing, that it requested Moore
be temporarily enjoined from ceasing production. According to Jet Stream, the agreed temporary
injunction represented "a compromise as to the scope of the injunctive relief granted, specifically
denying the relief requested by Appellees that Appellant not be permitted to continue production." (10) 
Jet Stream directs us to language in the petition that Moore be enjoined from "continuing to produce
the property . . . ." This language, however, is contained in paragraph VIII of Jet Stream's original
petition which requests a permanent injunction. (11) Paragraph IX of Jet Stream's original petition
provides as follows, in pertinent part:

 Defendant should be cited to appear and show cause why he or it should not be
temporarily restrained, during the pendency of this action, from shutting in
production of oil, gas or other minerals from the Property, from removing the
equipment or plugging the Wells located on the Property, from accepting the
proceeds of sale for gas produced from the Property from any third party, and upon
hearing, why a receiver should not be appointed to operate the Wells.


(Emphasis added.) As demonstrated by the quoted language, Jet Stream affirmatively requested in
its original petition that production continue. (12) 

 We note the Austin Court of Appeals has held a party cannot rely on a temporary injunction
as evidence of good faith because a temporary injunction is merely intended to preserve the status
quo. Rauch, 905 S.W.2d at 410. We agree with the Austin court that most temporary injunctions
will not be evidence of good faith. This case, however, is distinguishable from Rauch. The
temporary injunction in Rauch was not an agreed temporary injunction, and there is no indication
that the mineral owner affirmatively requested the operator be temporarily enjoined from ceasing
production. In this case, Jet Stream affirmatively requested production to continue in its original
petition and agreed to a temporary injunction which was signed several months later. In the
temporary injunction, Jet Stream agreed "the Defendant is required to continue to operate the wells
as has been operated in the past without any discontinuation of production."

 Moore does not specify which form of estoppel should apply in this case. We conclude
quasi-estoppel is most applicable here. The doctrine of quasi-estoppel precludes a party from
asserting, to another's disadvantage, a right inconsistent with a position previously taken. Lopez v.
Munoz, Hockema & Reed, 22 S.W.3d 857, 864 (Tex. 2000). The doctrine applies when it would be
unconscionable to allow a person to maintain a position inconsistent with one to which he or she
acquiesced, or from which he or she accepted a benefit. See id.; Maguire Oil Co. v. City of Houston,
69 S.W.3d 350, 367 n.7 (Tex. App.--Texarkana 2002, pet. denied); Vessels v. Anschutz Corp., 823
S.W.2d 762, 765-66 (Tex. App.--Texarkana 1992, writ denied). Jet Stream successfully requested
that Moore be temporarily enjoined from ceasing production and accepted the benefit of that
position. As such, Jet Stream should be estopped from alleging Moore's conduct, which Jet Stream
requested and benefitted from, was wrongful. Moore should not be punished for the conduct.

 In its response, Jet Stream also argues Moore failed to present any evidence regarding the
costs of production. Moore testified the costs of production account for approximately sixty percent
of gross revenues. While Moore could have presented better evidence, Moore's testimony is more
than a scintilla of evidence. There is some evidence of the value of the minerals minus drilling and
operating costs. 

 Jet Stream affirmatively requested, in its petition and in the agreed temporary injunction, that
production continue. As such, Jet Stream is estopped from seeking damages for bad faith trespass. 
Jet Stream's recovery should be limited to damages for good faith trespass--the value of the minerals
minus drilling and operating costs. The trial court erred in awarding damages for bad faith trespass
based on gross revenues.

VIII. The Evidence Supporting the Award for Underpayment of Royalties Is Sufficient

 In his last point of error, Moore argues the only evidence concerning the underpayment of
royalties is hearsay and the evidence is insufficient. (13) At trial, William L. Rudd, III, testified he
calculated the underpayment of royalties from a review of the Texas Railroad Commission reports
posted online. Rudd failed to testify how he made these calculations and failed to provide the proper
foundation for the online reports.

 The admission and exclusion of evidence is committed to the trial court's sound discretion;
thus, we review this issue under an abuse of discretion standard. City of Brownsville v. Alvarado,
897 S.W.2d 750, 753 (Tex. 1995). A trial court abuses its discretion when it acts without regard for
any guiding rules or principles. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42
(Tex. 1985). Moore failed to object in the trial court to the evidence. In fact, Moore stated he had
"no objection" to the evidence. Whether the trial court abused its discretion in admitting the hearsay
is not preserved for appellate review. See Tex. R. App. P. 33.1. 

 Even if the evidence is hearsay, we can consider, in an evidentiary sufficiency review,
hearsay evidence admitted without an objection. (14) Wilson, 168 S.W.3d at 812 n.29; see Tex. R.
Evid. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value
merely because it is hearsay."). The test for legal sufficiency is "whether the evidence at trial would
enable reasonable and fair-minded people to reach the verdict under review." Wilson, 168 S.W.3d
at 827. When conducting a factual sufficiency review, a court of appeals can set aside the verdict
only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong
and unjust. Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998); Cain v. Bain, 709
S.W.2d 175, 176 (Tex. 1986). The evidence is more than a scintilla of evidence and the evidence
is not controverted. The evidence is legally and factually sufficient.

IX. Our Opinion Might Affect the Award of Attorney's Fees

 On rehearing, Moore argues because he obtained some relief, "the award of attorney's fees
for appeal should either be set aside or awarded to both Appellant and Appellee." Jet Stream
requested and obtained attorney's fees under the Declaratory Judgments Act. Under Section 37.009,
a trial court may award reasonable and necessary attorney's fees that are "equitable and just." Tex.
Civ. Prac. & Rem. Code Ann. § 37.009 (Vernon 2008). "A prevailing party in a declaratory
judgment action "is not entitled to attorney's fees simply as a matter of law; entitlement depends on
what is equitable and just, and the trial court's power is, in that respect, discretionary." Save Our
Springs Alliance, Inc. v. Lazy Nine Mun. Util. Dist., 198 S.W.3d 300, 319 (Tex. App.--Texarkana
2006, pet. denied); see Sharp v. Hobart Corp., 957 S.W.2d 650, 654 (Tex. App.--Austin 1997, no
pet.). An award of attorney's fees under the Declaratory Judgments Act is not dependent on a finding
that a party "substantially prevailed." Barshop v. Medina County Underground Water Conservation
Dist., 925 S.W.2d 618, 637 (Tex. 1996); see Bocquet v. Herring, 972 S.W.2d 19, 20 (Tex. 1998);
Flagship Hotel, Ltd. v. City of Galveston, 117 S.W.3d 552, 566 (Tex. App.--Texarkana 2003, pet.
denied). As such, the fact that Moore prevailed on two issues (15) does not dictate that attorney's fees
should be awarded. 

 A reversal of the trial court's decision does not necessarily mean the award of attorney's fees
was an abuse of discretion. Sava Gumarska in Kemijska Industria D.D. v. Advanced Polymer Scis.,
Inc., 128 S.W.3d 304, 324 (Tex. App.--Dallas 2004, no pet.). Although, under the facts of this case,
the trial court's award would not be an abuse of discretion, the trial court might exercise its discretion
differently in light of our opinion in this case. When a judgment is reversed on appeal, the reversal
may affect whether the award of attorney's fees is equitable and just. Id.; see also Barshop, 925
S.W.2d at 637. "The trial court's decision whether to award attorney's fees in a declaratory judgment
case depends on the court's conclusion whether it is just and equitable to do so under all the
circumstances of the case . . . ." In re Estate of Kuykendall, 206 S.W.3d 766, 772 (Tex.
App.--Texarkana 2006, no pet.). Because our opinion on rehearing might affect the trial court's
determination, we will remand the award of attorney's fees to the trial court for a determination of
whether, in light of our opinion, the award is equitable and just.

Conclusion

 We modify the trial court's judgment, affirm as modified in part, and reverse and remand in
part. We reverse the award of damages for bad faith trespass and remand that portion of the case to
the trial court for further proceedings consistent with this opinion. We also reverse the portion of
the judgment awarding attorney's fees to Jet Stream and remand this portion of the case to the trial
court for a determination of whether, in light of our opinion, an award of such fees to Jet Stream is
"equitable and just." We modify the trial court's judgment to remove the permanent injunction
prohibiting Moore from removing his equipment, with the exception of the well casing, from the
lease property. As modified, we affirm the judgment of the trial court. 




 Jack Carter

 Justice


Date Submitted: August 7, 2008

Date Decided: August 8, 2008

1. Moore states in his summary judgment affidavit that coverage was denied due to insufficient
liquid collateral and the lack of general liability insurance, which he had never been required to
carry. According to Moore, "[i]n essence, I was rejected because I was too small an operator." 
2. Of the numerous copies of the lease introduced into the record, none of the copies contains
a complete legible copy of the statement at issue. This quotation is the product of combining two
incomplete copies of the lease. We emphasize that the parties should make sure the record
accurately reflects the entire document at issue--particularly the clauses being disputed.
3. Moore argues in his brief: "[i]f Appellant is not entitled to defend Appellee's suit under the
force majeure clause as argument in Issue No. 1 above under the theory that he was diligent in
meeting the financial assurance requirements of the Railroad Commission, then he is entitled to a
trial on that issue." Moore concludes the argument with the assertion that "[i]f his diligence is an
issue, Appellant should be able to try this issue and summary judgment should be deemed
inappropriate because of this fact." If Moore is raising the issue of due diligence in the context of
a defense other than the force-majeure clause, Moore's brief fails to specify what defense is being
argued. To the extent this argument can be interpreted as raising a defense other than the force-majeure clause, the argument is inadequately briefed. See Tex. R. App. P. 38.1(h). Further, Moore
has failed to preserve any other defenses by raising them in the trial court. See Tex. R. App. P. 33.1.
4. The record contains a release dated April 1, 1952, from Phillips Petroleum Company in
which Phillips surrenders all interest in the Perry Tract. The parties have not directed us to where
the record contains evidence of how Phillips obtained its interest under the lease. To the extent the
best evidence rule would require the introduction of the writing proving Phillips' interest, Moore
waived any error by failing to object in the trial court. See Tex. R. App. P. 33.1; Tex. R. Evid. 1002. 
Moore did not introduce any evidence contradicting Rudd's testimony.
5. We note paragraph 5 of the lease contains two specific time limits: a thirty-day provision
and a sixty-day provision. Jet Stream argues the thirty-day limit applies. This opinion should not
be interpreted as holding the thirty-day provision applies to the facts of this case. It is not necessary
for us to decide which specific time limit applies because it is uncontested that production ceased
for more than sixty days. 
6. We note the Beaumont Court of Appeals has construed a similar provision and awarded the
lessee forty acres around each producing well. Hunt Oil Co. v. Dishman, 352 S.W.2d 760 (Tex. Civ.
App.--Beaumont 1961, writ ref'd n.r.e.). Hunt Oil, though, is clearly distinguishable from the
current case. In Hunt Oil, the lease was not terminated for lack of production and there were wells
producing when the lease terminated. Id.
7. Jet Stream did not object when Moore presented evidence concerning the value of the
oilfield equipment. In its brief, Jet Stream alleges this issue was set for trial on the merits. 
8. Moore presented the estoppel theory to the trial court in his arguments in support of his
motion for new trial. 
9. "When one enters into possession of land and makes improvements thereon with full
knowledge of the pendency of an action to enforce an adverse claim to the premises, one is
conclusively considered a trespasser in bad faith." Mayfield, 693 S.W.2d at 504; see Houston Prod.
Co. v. Mecom Oil Co., 62 S.W.2d 75 (Tex. Comm'n App. 1933); NRG Exploration, Inc. v. Rauch,
905 S.W.2d 405, 410 (Tex. App.--Austin 1995, writ denied). But see Byrom v. Pendley, 717
S.W.2d 602, 604 (Tex. 1986) (no bad faith trespass when cotenant leases mineral rights). 
10. Jet Stream claims the "agreement was that Appellant Moore is permitted to continue
production, and the prevailing party to the litigation recovers the proceeds of production." This
argument, though, would require us to go outside the record for facts not in evidence. This we
decline to do.
11. We note the relevant language in Jet Stream's amended petition is identical to Jet Stream's
original petition. Because the issue here is what position Jet Stream successfully requested, we will
refer to the original petition rather than the amended petition.
12. We note Jet Stream requested that a receiver be appointed to operate the wells. While this
is evidence that Jet Stream did not desire Moore to continue production, it indicates a desire not to
cease production. Further, as noted above, Jet Stream agreed to a temporary injunction requiring
Moore to continue production.
13. Although the record contains evidence that Moore accepted the reduced royalty payments
and Moore complains that Jet Stream failed to introduce any of the division orders, Moore does not
argue on appeal that Jet Stream is estopped from collecting underpayment of royalties. Moore's
complaint on appeal is limited to challenging the evidence introduced by Jet Stream.
14. We note the Texas Supreme Court has stated, "[i]t has long been the rule in Texas that
incompetent evidence is legally insufficient to support a judgment, even if admitted without
objection." City of Keller v. Wilson, 168 S.W.3d 802, 812 & n.29 (Tex. 2005). On rehearing, Moore
argues Rudd's testimony is incompetent because Rudd failed to introduce "division orders or some
title history of the royalties." Moore has failed to cite any authority that such a failure would render
the testimony incompetent. See Tex. R. App. P. 38.1(h).
15. This Court has held the prevailing party is the party to the suit who successfully prosecutes
the action or successfully defends against it, prevailing on the main issue, even though not to the
extent of its original contention. Flagship Hotel, 117 S.W.3d at 564. Moore is not the prevailing
party because he did not prevail on the main issue--the termination of the lease.