**HUNT OIL COMPANY et al., Appellants,**

v.

**H. E. DISHMAN et al., Appellees.**

**No. 6503.**

Court of Civil Appeals of Texas.

Beaumont.

Nov. 9, 1961.

Rehearing Denied Dec. 13, 1961.

Shank, Dedman & Irwin, Dallas, Keith, Mehaffy, McNicholas & Weber, Beaumont, for appellants.

Bowers & Bowers, Beaumont, for appellees.

McNEILL, Justice.

This suit was instituted by appellees against appellants to remove cloud from the title to a tract of 320 acres (except 40 acres thereof), retained by appellant Hunt Oil Company out of the mineral lease referred to in the succeeding paragraph. The dispute has grown out of the proper construction of a settlement agreement disposing of a previous suit over whether there had been reasonable development of the leased premises. Judgment below sustained appellee's position and removed the cloud on the disputed acreage. Appellant Hunt Oil Company will sometimes be referred to herein as Hunt or Hunt Oil Company.

On April 4, 1947, H. E. Dishman and Harry Lucas, as lessors, executed the lease

covering 1,660.5 acres in the Wm. McFarland League, Jefferson County, to W. C. Schmitz as lessee. The lease was for a primary period of 5 years and as long thereafter as oil, gas or other minerals may be produced from said land. It had the usual clause that if operations for drilling were not commenced on the land within one year, lessee may extend the lease for a period of 12 months by paying certain rental. In like manner this period may be extended for successive periods of 12 months during the primary term. The lease provided that lessee may at any time or times execute and deliver to lessor a release covering any portion or portions of said premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and any future rentals would be reduced proportionately. This lease provided further * * * "if after discovery of oil, gas or other minerals, the production thereof should cease from any cause, the terms of this shall not terminate if lessee commences additional drilling or reworking operations within sixty days thereafter * * *."

Paragraph 8 of the lease is:

"In the event Lessor considers that operations are not at any time being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if in default, shall have sixty (60) days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this instrument. After the discovery of oil, gas or other mineral in paying quantities on said premises, Lessee shall reasonably develop the acreage retained hereunder. Lessee agrees to protect the premises from drainage at all times. In case of cancellation or termination of this lease for any cause, Lessee shall have the right to retain under the terms hereof forty acres of land around each well producing, being worked on, or drilling hereunder, unless, in order to comply with an order, rule or regulation of governmental authority or agency, more than forty acres has been allotted to each well, in which case Lessee shall have the right to retain around each such well the number of acres so allotted to each well. The tract so retained shall be designated by Lessee in as near a square form as practicable."

This lease was assigned by lessee to J. S. Abercrombie, who, in turn, assigned it to Hunt Oil Company reserving an overriding royalty. Drilling commenced on this lease in February, 1948, and the Dishman-Lucas No. 1 well was completed and abandoned as a dry hole in April, 1948. A second well commenced in February, 1949, turned out to be a dry hole and the third well was drilled in December, 1949, and also resulted in a dry hole. On April 4, 1950 Hunt Oil Company executed a partial release of the lease whereby the northerly one-half of the tract was released and the southerly one-half retained. On December 27, 1951 the Dishman-Lucas No. 4 well was commenced on the retained portion of the lease. This well was drilled to a depth of about 8,700 feet. It was completed as an oil well in the 5,320 foot zone February 21, 1952. During the drilling of this well an electric log test was obtained showing that there were two zones, one from 8,590 to 8,600 feet and one from 5,300 feet to 5,380 feet which might contain oil and gas reserves, and when the well was completed tests were run on the lower zone, indicating the presence of gas, but after the test the well was completed as an oil well at the upper level. Said well has subsequently produced oil and/or gas in paying quantities.

However, after the Dishman-Lucas No. 4 well was drilled there was no further drilling operation upon said retained premises for a period of over five years, and on June 17, 1957 appellees, constituting the successors in interest to lessors, instituted suit against appellant Hunt Oil Company and others for alleged failure of reasonable development of the unreleased southerly por-

tion of the lease. On September 10, 1957, the settlement agreement here involved was executed between Hunt Oil Company, et al., and H. E. Dishman, et al., whereby the disputed issues in said suit were settled upon the terms and provisions therein set forth. After describing Hunt, et al., as First Party and Dishman, et al., as Second Party and the isssues in the suit were being settled, the agreement then provides that First Party shall pay $5,000 to Second Party. Par. I then provides that Second Party shall dismiss the suit and Par. II requires First Party to pay $1,000 to Second Party's attorneys in connection with the suit. We quote the balance of this agreement:

"III.

"First Party agrees to commence or cause to be commenced, within sixty (60) days from and after the date hereof, operations for the drilling of a well for oil and gas at a location to be selected by First Party on the Leased Premises, and to thereafter continue such operations and the drilling of said well in a diligent and workmanlike manner to a depth sufficient to test:

"a. The upper Hackberry formation producing zone, as identified and producing at a depth of approximately 8080 feet to 8086 feet * * *; and

"b. The Nodosaria formation producing zone, as identified and producing at a depth of approximately 8568 feet to 8572 feet * * *.

First Party shall thereafter, in like manner, conduct continuous drilling operations on the Leased Premises by commencing operations for drilling an additional well for oil and gas within one year from and after the completion of the first well hereunder either as a dry hole or as a producer, and from and after the completion of each succeeding well to be drilled by First Party on the Leased Premises by virtue hereof.

"IV.

"If First Party fails to commence and drill the first well as required hereunder, or any succeeding well, said lease shall terminate without further liability on First Party and First Party shall release the same of record, as to all the leased premises except forty (40) acres in as near the form of a square as practical around each producing oil well, and except 320 acres in as near the form of a square as practical around each producing gas well, in either case said well to be in as near the center of said acreage as is practical. For the purposes hereof, a gas well shall be considered to be a producing gas well if gas therefrom cannot be marketed at a fair price and if First Party pays monthly the shut-in royalty thereon as provided in said lease.

"V.

"Compliance by First Party with the provisions hereof shall constitute full and complete satisfaction of all drilling and development obligations under said lease, either express or implied, as to the Leased Premises."

In accordance with this agreement, Hunt commenced and drilled the Dishman-Lucas No. 5 well which was completed as a dry hole on November 7, 1957. Under its obligation in the settlement agreement Hunt would have been required to start drilling or another well on or before November 7, 1958. It however elected not to drill another well following completion of the No. 5 well as a dry hole, but chose to suffer the penalties. On October 18, 1958, evidently after having decided to suffer the penalties, it commenced reworking operations on the Dishman-Lucas No. 4 well in order to convert the same to a gas well, for the express purpose of attempting to hold 320 acres of land under the settlement agreement. This operation was successful and the well was recompleted as a gas well on November 4,

1958. It was classified as a gas well by the Railroad Commission on November 11, 1958, and produced gas for a part of November and December, 1958, but in January, 1959, the Dishman-Lucas No. 4 well reverted to an oil well.

On November 14, 1958, in seeking to comply with its settlement agreement, Hunt released all of the 830 acres retained except 320 acres surrounding said gas well. About 11 months after the reversion of said gas well to an oil well appellees made demand upon Hunt to release all of the 320 acres retained except a tract of 40 acres surrounding the well as an oil well. Hunt refused, and the present suit was instituted by appellees against it and others to remove cloud from appellees' title to the 320 acres, except for an area of 40 acres surrounding the well to be taken as near as practicable in a square. Appellants say that under said settlement agreement, construed either separately or in connection with the original lease, Hunt Oil Company has performed its whole duty to appellees with respect to the matters involved when it executed, on November 14, 1958, a release of all the premises except 320 acres; that the lease as to the balance of the 830 acres terminated on November 7, 1958, and there was no "further liability" on its part to appellees. In connection with this it is asserted that the lease granted to appellees a determinable fee-simple estate in the minerals under the leased premises; and such vested estate could not be forfeited under the holding in Decker v. Kirlicks, 110 Tex. 90, 216 S.W. 385, in the absence of an agreement, the provisions of which are plain, clear and of such unequivocal character as to render its exercise fair and rightful.

The question before us is novel. No authority directly passing upon the problem has been found by counsel and we have found none. In order to construe the rights of the parties we are required to consider the original lease and the settlement agreement together in the light of the situation of the parties and the circumstances surrounding the transaction. Ryan v. Kent (Tex.Com.App.) 36 S.W.2d 1007; Roseborough v. Loftus, Tex.Civ.App., 13 S.W.2d 950; 31-A Tex.Jur. 938; 13 Tex. Jur.2d 277. Having in mind the terms of the original lease, let us consider the circumstances leading up to the settlement agreement. Although oil was discovered in 1952 in Dishman-Lucas No. 4 well, no additional well was drilled for over five years on the leased premises and in June, 1957, appellees instituted the first suit to cancel the lease for failure to reasonably develop. Under circumstances extraordinary in character the right to cancel a lease for failure to develop will lie. W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27. We need not say whether the circumstances here were extraordinary as the parties compromised their differences exemplified in this suit by the above settlement agreement. The sum of $5,000 was paid appellees and $1,000 to their attorneys. Hunt Oil Company there (Par. III) also undertook to commence the drilling of a well within 60 days and to continue drilling operations diligently to certain subsoil structures; and on or before each year to commence and diligently drill an additional well for oil and gas. But Par. IV provides if Hunt shall fail to do this the lease shall terminate "without further liability" on it "and First Party shall release the same of record, as to all the Leased Premises" except 40 acres around each producing oil well and 320 acres around each producing gas well. Par. V provides compliance with the provisions of the agreement "shall constitute full and complete satisfaction of all drilling and development obligations under said lease, either express or implied." It is thus seen that the effect of this settlement agreement was to modify, and as modified, provide in much detail for the undertaking substituted for the original obligation of Hunt Oil to reasonably develop the leased premises, as well as to modify the original lease provision providing in case of cancellation or termination it could retain 40 acres around each well. Thus the failure to

so perform, as modified, resulted in the loss of all mineral acreage except the 320 acres around the gas well. As long as this well produced gas in paying quantities so long did Hunt own the mineral estate in 320 acres. But it is without dispute that the well, as a gas well, ceased production of gas by January 1, 1959. There was no attempt to start reworking operations within the 60 day period required in Par. 8 of the lease. As testified to by Hunt's geologist, the gas well reverted to an oil well, and since then has been classified as an oil well and as such has been continuing production of oil to time of the trial.

The settlement agreement made no express provision controlling a well that would change from oil to gas or from gas to oil production. In this situation we think the problem should be considered as though two different locations were producing—one as a gas well of 320 acres and the other an oil well of 40 acres. If the gas well in this example should cease production and no effort was made to renew its life, the 320 acres would revert to the lessor. Likewise, if such an oil well ceased production and no effort was made to renew it, the 40 acres would likewise revert. That the wells occupied the same location should not require a different solution under the facts before us. We conclude that the terms of the settlement agreement, when construed in connection with and as part of the lease under the circumstances involved, are plain and clear. Consequently we hold that after the end of gas production in Dishman-Lucas No. 4 and failure to attempt reworking operations looking to further gas production, Hunt lost its determinable fee in the 320 mineral acres, except the 40 acre area for the well as an oil well.

But Hunt argues that if a well originally holding 320 acres may later be cut to 40 acres under the settlement agreement, then a well holding 40 acres should likewise upon later production of gas, cover 320 acres. We are not persuaded by this argument. In the first place Hunt realized this would not follow since it purposely cut off oil production in Dishman-Lucas No. 4 and reworked it to produce gas so that by November 7, 1958 it could hold 320 mineral acres. In the second place, neither the original lease nor the agreement provides for any such revesting of the mineral estate in other acreage when the lease is once canceled or terminated except as to isolated production.

Hunt also argues that since Par. IV of the agreement provides in case it defaults in its drilling program, said lease shall terminate without "further liability" on it, and to hold a further release of acreage is required, is placing "further liability" on it. We do not so construe this term. The language "and First Party shall release the same of record" follows immediately upon the language "said lease shall terminate without further liability on First Party." Suppose Hunt had not executed the release it did on November 14, 1958. Could it be contended that this failure was a "liability" of which Hunt was relieved? We think not. When the lease is terminated "further liability" as used in the agreement, ipso facto ceases while the expressly stated duty to furnish such release follows thereafter. In our judgment "liability" as used in the agreement has to do with liability for further development of the retained acreage. This was clearly the intent of the parties. Except for the modification of the development clause and the clause for retaining 40 acres around each well in the original lease, most, if not all, other obligations remain in effect. Although the payment of future royalty is no doubt a liability, Hunt was surely not relieved from paying further royalties of the production to be received thereafter, nor was it relieved from the duty of executing a release that will be due when production ceases on the 40 acres around the No. 4 well. Kidd v. Hoggett, Tex.Civ.App., 331 S.W.2d 515. Neither was it relieved of other obligations in said lease still in effect. And yet, if we apply appellants' meaning of "further liability", this would necessarily follow.

We are of the opinion that when the settlement agreement is fairly construed in connection with the lease and the circumstances surrounding the parties, the duty upon Hunt to give the additional release is clear, and the trial court's judgment should be affirmed.

Affirmed.