In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00106-CV


______________________________




JEFF MOORE, D/B/A T & M PRODUCTION, Appellant



V.



JET STREAM INVESTMENTS, LTD., SARA P. RUDD,


EXECUTRIX OF THE ESTATE OF J. B. RUDD, AND

YOUNGBLOOD PROPERTIES, L.P., Appellees



 


On Appeal from the 71st Judicial District Court


Harrison County, Texas


Trial Court No. 05-1140




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Carter



O P I N I O N



 Jeff Moore, d/b/a T & M Production, appeals the final judgment of the trial court declaring
that an oil and gas lease had terminated due to nonproduction. Moore had been operating as an
assignee of a 1943 lease which contained a five-year primary term and continued thereafter as long
as oil or gas was produced. On August 20, 2004, after Moore failed to comply with an order from
the Texas Railroad Commission regarding posting financial assurance, the Commission ordered that
he cease production. Production did not resume until July 15, 2005. Shortly after Moore resumed
production, William L. Rudd, III, acting "[o]n behalf of the mineral owners," sent Moore a letter
alleging the lease had terminated. Jet Stream Investments, Ltd., Sara P. Rudd, Executrix of the
Estate of J. B. Rudd, and Youngblood Properties, L.P., brought suit seeking a declaratory judgment
that the lease had terminated. 

 Moore filed a motion for summary judgment, and Jet Stream filed a competing motion for
partial summary judgment. The trial court granted a partial summary judgment to Jet Stream and
denied Moore's motion for summary judgment. The trial court set a trial on the merits, specifically
noting the following issues: (a) whether any other wells are located on the lease acreage and holding
the lease, (b) the amount of damages for underpayment of royalty, (c) the amount of damages for
conversion of oil and gas by Moore, and (d) the amount of attorney's fees. After the bench trial, the
trial court rendered judgment in favor of Jet Stream and awarded damages in the amount of
$94,752.24, plus attorney's fees. The final judgment incorporates the prior partial summary
judgment.

 Moore raises eight issues on appeal: 1) whether the force-majeure clause prevented
cancellation of the lease despite the lack of production, 2) whether there was a fact issue on due
diligence, 3) whether the lease was held by production by other operators, 4) whether the implied
temporary cessation doctrine applies, 5) even if the lease terminated, whether Moore is entitled to
continue to produce from forty acres around each well, 6) whether the trial court erred in denying
Moore's counterclaim seeking recovery of his property and fixtures, 7) whether the trial court erred
in awarding Jet Stream damages measured by gross oil sales when Moore continued to produce after
notice from Jet Stream that the lease had terminated, and 8) whether the trial court erred in awarding
damages to Jet Stream for underpayment of royalties. We modify the trial court's judgment to permit
Moore to recover his oilfield equipment, except the well casing, and as modified, affirm the
judgment of the trial court.

I. The Railroad Commission Order Is Not a Force-Majeure Event

 The trial court granted Jet Stream's motion for partial summary judgment, which argued the
force-majeure provision does not apply where the cause of production is the result of lessee's failure
to comply with the Texas Railroad Commission's regulations. To prevail on a traditional motion for
summary judgment, a movant must establish that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); City of Houston
v. Clear Creek Basin Auth., 589 S.W.2d 671 (Tex. 1979); Baubles & Beads v. Louis Vuitton, S.A.,
766 S.W.2d 377 (Tex. App.--Texarkana 1989, no writ). When reviewing a summary judgment, we
take as true all evidence favorable to the nonmovant and indulge every reasonable inference and
resolve any doubts in the nonmovant's favor. Limestone Prods. Dist., Inc. v. McNamara, 71 S.W.3d
308, 311 (Tex. 2002); Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223 (Tex. 1999). 

 An oil and gas lease "is not a 'lease' in the traditional sense of a lease of the surface of real
property. In a typical oil or gas lease, the lessor is a grantor and grants a fee simple determinable
interest to the lessee, who is actually a grantee." Natural Gas Pipeline Co. of Am. v. Pool, 124
S.W.3d 188, 192 (Tex. 2003) (footnotes omitted). When a lessee retains only a royalty interest, the
lessor acquires title to "all of the oil and gas in place, and the lessor owns only a possibility of
reverter and has the right to receive royalties." Id. The oil and gas lessee acquires ownership of all
the minerals subject to the possibility of reversion to the lessor. Id. The lease in this case provides,
in pertinent part, as follows:

 2. Subject to the other provisions herein contained, this lease shall be for a
term of Five years, from this date (called "primary term") and as long thereafter as
oil, gas or other mineral is produced from said land or land which said land is pooled
hereunder.


 . . . .


 5. If prior to discovery of oil, gas, sulphur or other mineral on said land,
lessee should drill a dry hole or holes, thereon, or if after discovery of oil, gas,
sulphur or other mineral, the production thereof should cease from any cause, this
lease shall not terminate if lessee commences operations for additional drilling or
reworking within sixty days thereafter . . . . If at the expiration of the primary term
oil, gas or other mineral is not being produced on said land but Lessee is then
engaged in drilling or reworking operations thereon, the lease shall remain in force
so long as operations are prosecuted with no cessation of more than thirty (30)
consecutive days, and if they result in production of oil, gas or other mineral so long
thereafter as oil, gas or other mineral is produced from said land.


 Texas Railroad Commission rules require operators of oil and gas wells to post financial
assurance for the purpose of making certain that oil and gas wells are properly capped when
production from them ceases. Prior to 2002, the Commission permitted small operators, including
Moore, to pay a $1,000.00 fine in lieu of providing this additional financial assurance. After the
Railroad Commission announced it would require all operators to provide financial assurance, Moore
contacted three insurance agencies and coverage was denied. (1) On May 28, 2002, Moore requested
a hearing at the Railroad Commission on the issue. Moore's application for a hearing was denied
November 14, 2003. While his request for a hearing was pending, Moore learned that a court-ordered temporary injunction had been issued prohibiting the Texas Railroad Commission from
enforcing the rule changes. Shortly after Moore learned the litigation had been resolved in favor of
the Texas Railroad Commission, the Commission ordered Moore to cease production for failure to
post a "P-5 Certificate of Financial Assurance." Moore received the order, dated August 12, 2004,
and on August 20, 2004, ceased operations. On August 24, 2004, Moore applied to a bank for an
irrevocable letter of credit, which was denied several months later. Moore eventually obtained a
letter of credit from another bank May 20, 2005. After rejecting the bank's letter of credit twice for
errors of form, the Texas Railroad Commission accepted it as the required financial assurance
July 15, 2005, and Moore resumed production. It is uncontested that Moore ceased production
between August 20, 2004 and July 15, 2005--a period of almost eleven months.

 Because production was ceased pursuant to an order from the Texas Railroad Commission,
Moore argues that the "force-majeure" clause contained in the lease precludes termination of the
lease for nonproduction. A "force-majeure clause" is generally defined as a "contractual provision
allocating the risk if performance becomes impossible or impracticable, esp. as a result of an event
or effect that the parties could not have anticipated or controlled." Black's Law Dictionary 674
(8th ed. 2004). In the oil and gas context, the purpose of a force-majeure clause "is to excuse the
lessee from non-performance of lease obligations when the non-performance is caused by
circumstances beyond the reasonable control of the lessee . . . or when non-performance is caused
by an event which is unforeseeable at the time the parties entered the contract." Hydrocarbon
Mgmt., Inc. v. Tracker Exploration, Inc., 861 S.W.2d 427, 435-36 (Tex. App.--Amarillo 1993, no
writ) (citations omitted). When a lessee raises a force-majeure clause as an excuse for
nonperformance, the lessee bears the burden of proof to establish that defense. Id. 

 The force-majeure clause in the lease (2) provides as follows:

 11. All terms and express or implied covenants of this lease shall be subject
to all Federal and State Laws, Executive Orders, Rules and Regulations, and this
lease shall not be terminated, in whole or in part, nor Lessee held liable for damages,
for failure to comply therewith, if compliance is prevented by, or if such failure is the
result of, any such Law, Order, Rule or Regulation.


Moore claims the force-majeure clause excused the lack of production because the lease does not
require the event must be beyond the control of the lessee. Jet Stream claims the force-majeure
clause requires that the event be beyond the control of the lessee. 

 In Frost National Bank v. Matthews, this Court held that a force-majeure clause prevented
the termination of a mineral lease when the production was ceased pursuant to a shut-in order by the
Texas Railroad Commission. 713 S.W.2d 365, 367 (Tex. App.--Texarkana 1986, writ ref'd n.r.e.). 
Frost National Bank, though, is distinguishable from the current case. First, as noted by the Corpus
Christi Court of Appeals in Atkinson Gas Co. v. Albrecht, 878 S.W.2d 236, 241 (Tex. App.--Corpus
Christi 1994, writ denied), the order was not within the reasonable control of the current operator. 
The shut-in order was based on over-production by a prior operator. Frost Nat'l Bank, 713 S.W.2d
at 367. Second, this Court also relied on the fact that shut-in royalties were paid. Id. In the current
case, Moore does not allege shut-in royalties, or other rental payments, were available under the lease
or that they were paid. 

 Moore's argument is based on the analysis utilized by the Amarillo Court of Appeals in Sun
Operating Ltd. Partnership v. Holt, 984 S.W.2d 277 (Tex. App.--Amarillo 1998, writ denied). The
court held "when the parties have themselves defined the contours of force majeure in their
agreement, those contours dictate the application, effect, and scope of force majeure." Id. at 283
(citing Hydrocarbon Mgmt., 861 S.W.2d at 436; Tex. City Ref., Inc. v. Conoco, Inc., 767 S.W.2d
183, 186 (Tex. App.--Houston [14th Dist.] 1989, writ denied), disapproved on other grounds by
Ruiz v. Conoco, Inc., 868 S.W.2d 752, 757 (Tex. 1993) (venue)). The force-majeure clause will be
interpreted based on the plain, ordinary, and generally accepted meaning of the language. Id. at 288. 
Although the court in Holt found the event must be beyond the reasonable control of the lessee, the
conclusion was based on the language of the lease. Id. Moore argues that, since the language of the
lease does not specify that the event must be beyond his reasonable control, the lease does not
contain such a requirement. 

 We disagree that the language of the lease does not require the event to be beyond the control
of the lessee. The clause provides "this lease shall not be terminated . . . for failure to comply
therewith, if compliance is prevented by, or if such failure is the result of, any such Law, Order, Rule
or Regulation." As such, the lease requires compliance to be "prevented by" or "the result of, any
such Law, Order, Rule or Regulation." If the regulation is within the control of the lessee,
compliance is not prevented or the result of the regulation. Here, the requirement that Moore post
security did not compel the termination of production, but imposed conditions for all producers to
comply with in order to continue production. 

 When construing a lease similar to the lease in this case, the Corpus Christi Court of Appeals
reached a similar conclusion. See Albrecht, 878 S.W.2d 236. Similar to this lease, the lease did not
contain the phrase "beyond the reasonable control of the lessee." See id. at 242. Because the
operator had failed to comply with its regulations, the Railroad Commission ordered a well shut-in. 
Id. at 236. The court held the force-majeure clause was not triggered because the compliance was
within the reasonable control of the lessee. Id. 

 When construing a force-majeure clause identical to the clause in this case, the Tenth Circuit
has concluded the "governmental regulation at issue must preclude a lessee from performing the
sought-after relief." Watts v. Atl. Richfield Co., 115 F.3d 785, 796 (10th Cir. 1997). The court
reasoned that "[m]ere compliance with a governmental regulation" would not satisfy the force-majeure clause. Id. Because the lessee could have complied with the regulation at issue and still
have protected the unit from drainage, the court held the force-majeure clause did not protect the
lessee. Id. 

 Jet Stream introduced summary judgment evidence that other producers in the area were able
to comply with the financial assurance regulation. In his summary judgment affidavit, William L.
Rudd, III, states he was able to comply with the financial assurance regulation and "[o]ther operators
of the size of T&M Production were able to obtain financial assurance without a problem." Once
the movant establishes that it is entitled to summary judgment, the burden shifts to the nonmovant
to show why summary judgment should not be granted. Casso v. Brand, 776 S.W.2d 551, 556 (Tex.
1989). In his summary judgment affidavit, Moore states he requested a hearing in 2002 "because
bonds were for all practical purposes not available." Even if this is some evidence that bonds were
not available in 2002, this statement is not evidence that bonds were unavailable in 2004. Further,
the financial assurance was not required to be a bond. Ultimately, Moore obtained a letter of credit
from a bank rather than obtaining a bond. The statement does not indicate whether forms of
financial assurance, other than bonds, were available. Moore also introduced numerous articles from
The American Oil & Gas Reporter. Moore claims these articles create a fact issue. While the
articles discuss that many small operators were unable to comply with the financial assurance
requirements, the articles also state that some operators were able to comply with the regulations. 
Thus, Moore's own summary judgment evidence establishes at least some forms of financial
assurance were available. The summary judgment evidence conclusively established forms of
financial assurance were available. 

 As noted by the Fifth Circuit: "[i]f a contractor were able to escape his responsibilities
merely by causing an excusing event to occur, he would have no effective 'obligation to perform.'" 
Nissho-Iwai Co. v. Occidental Crude Sales, Inc., 729 F.2d 1530, 1540 (5th Cir. 1984) (whether
force-majeure clause in contract to deliver oil applied due to restrictions imposed by Libya). 
Because the evidence conclusively established forms of financial assurance were available, the Texas
Railroad Commission's regulation requiring financial assurance did not preclude compliance with
the lease. Similar to Watts, the regulation was not a force-majeure event. The trial court did not err
in granting Jet Stream's motion for partial summary judgment on this issue.

II. Due Diligence Was Not an Issue Under the Force-Majeure Clause

 Moore argues there is a fact issue concerning whether he was diligent in obtaining the
financial assurance requirements. (3) While due diligence is required for certain provisions of oil and
gas leases such as the implied covenant of reasonable development, due diligence is not an issue
when deciding whether a force-majeure clause applies. Unless the lease provides otherwise, Texas
law is well established that due diligence is not required under force-majeure clauses. See Holt, 984
S.W.2d at 283. Further, Moore did not argue there was a fact issue on diligence to the trial court. 
In his motion for summary judgment, Moore argued there were no genuine issues of material fact
concerning the force-majeure clause. This issue is not preserved for appellate review. See Tex. R.
App. P. 33.1. We overrule Moore's second point.

III. Production on the N.B. Perry Survey Did Not Hold the Lease

 Moore claims, in his third point of error, that there was production on the 1533.27 acres
originally leased under the 1943 lease. The evidence conclusively established that at least one well
was producing in the N.B. Perry Survey. The entire N.B. Perry Survey was among the property
included in the original 1533.27 acres covered by the lease. However, Rudd testified these wells
were released in 1954 from the 1943 lease. (4) For the sake of convenience, we will refer to the land
released from the 1943 lease as the Perry Tract and refer to the remainder of the land under the 1943
lease as the Rudd Tract.

 Moore claims that the production on the Perry Tract prevented the lease from terminating. 
The Texas Supreme Court has disagreed. In Ridge Oil, the Texas Supreme Court held that
production on the Ridge Tract did not hold the lease on the Guinn Tract after the lease had
terminated as to the Ridge Tract. Ridge Oil Co. v. Guinn Invs., Inc., 148 S.W.3d 143, 153 (Tex.
2004). Both tracts had previously been covered by the same 1937 lease. Id. However, when the
parties executed a new lease for the Ridge tract, the 1937 lease effectively terminated for the Ridge
Tract. Id. After the lease terminated, the Texas Supreme Court held the production on the Ridge
Tract no longer held the lease for the Guinn Tract. Similarly, the release of the Perry Tract from the
lease terminated the lease as to the Perry Tract. As such, production on the Perry Tract did not hold
the lease as to the Rudd Tract. 

 Moore argues that the language of the lease requires all production to cease on all the
property originally leased in 1943. In essence, Moore argues the fact that some of the acreage had
been released from the lease is irrelevant. Moore directs us to two provisions in the lease:

 2. Subject to the other provisions herein contained, this lease shall be for a
term of Five years, from this date (called "primary term") and as long thereafter as
oil, gas or other mineral is produced from said land or land which said land is pooled
hereunder.


 . . . .


 8. The rights of either party hereunder may be assigned in whole or in part,
and the provisions hereof shall extend to the heirs, successors and assigns of the
parties hereto, but no change or division in ownership of the land, rental or royalties
however accomplished shall operate to enlarge the obligations or diminish the rights
of lessee; and no such change in ownership shall be binding on lessee nor impair the
effectiveness of any payments made hereunder until lessee shall have been furnished,
forty-five (45) days before payment is due, a certified copy recorded instrument
evidencing any transfer, inheritance, sale, or other change in ownership. In the event
of assignment of this lease as to a segregated portion of said land, the rentals payable
hereunder shall be apportionable as between the several leasehold owners ratably
according to the surface area of each, and default in rental payment by one shall not
affect the rights of other leasehold owners, hereunder. If six or more parties other
than the original lessor become entitled to royalty hereunder, lessee may withhold
payment of royalty to such parties unless and until furnished with a recordable
instrument executed by all of such parties designating an agent to receive payment
for all.


According to Moore, the above provisions of the lease preclude the lease from terminating because
production occurred on a tract of land described in the lease even though the tract upon which
production had continued had been released from the lease. 

 Moore argues, because the lease provides "no change or division in ownership of the land,
rental or royalties however accomplished shall operate to enlarge the obligations or diminish the
rights of lessee," the release from the lease of the only producing tract is not relevant. The second
provision, contained in paragraph 8, appears to be an entirety clause. An entirety clause is intended
"to preserve the lease as an indivisible operating unit despite transfers of title by the lessor." 
4 Kuntz, The Law of Oil & Gas, § 48.2, p. 144 (1990); 4-6 Williams & Meyers, Oil & Gas Law
§ 678 (Lexis 2006). The clause in paragraph 8 references changes in rental payments and royalties
based on assignments or other changes in ownership. It specifically provides "rentals payable
hereunder shall be apportionable." One of the purposes of an entirety clause is to relieve the parties
of the obligations of the nonapportionment rule. 4 Kuntz, The Law of Oil & Gas, § 48.2, p. 144. 
The nonapportionment rule provides that royalty payments will only be paid to the extent of the
lessor's interest in the tract where the well is located. Id. at p. 145. The nonapportionment rule may
cause a lessor to duplicate equipment and require a lessor to protect against internal drainage, i.e.,
drainage from another subdivided portion of the same leased premises. Id. at pp. 144-46. 

 Paragraph 8 only prohibits changes in ownership under the lease from enlarging the
obligations or diminishing the rights of the lessee; it does not apply to tracts of land which have been
released from the lease. Moore ignores the beginning phrase of the paragraph which provides "[t]he
rights of either party hereunder." The use of the word "hereunder" implies the clause only applies
to tracts of land to which the lease applies. The rest of the paragraph indicates such a conclusion was
the intent of the parties. The rest of the paragraph contains the following phrases: "payments made
hereunder," "assignment of this lease," and "other leasehold owners hereunder." We conclude the
intent of the parties was for the paragraph to only apply to tracts of land still bound by the lease. 
Therefore, the prohibition in paragraph 8 does not apply to changes of ownership of tracts which
have been released from the lease. 

 The first provision, contained in paragraph 2 of the lease, merely references the land without
any qualification for whether the acreage had been released from the lease. Thus, Moore argues
production on land described in the lease will hold the lease regardless of whether the lease still
applies to the property. The lessor is permitted, under the lease, to release tracts of land from the
lease. The lease provides:

 4. . . . Lessee, or any assignee hereunder, may at any time execute and deliver
to lessor, or to the depository above named, or place of record, a release or releases
covering any portion or portions of the premises held by him, and thereby surrender
this lease as to such portion or portions, and thereafter the rentals payable by him
shall be reduced proportionately.


When construing a lease, we must examine the entire lease and attempt to harmonize all its
provisions. Anadarko Petroleum Corp. v. Thompson, 94 S.W.3d 550, 554 (Tex. 2002); Coker v.
Coker, 650 S.W.2d 391, 393 (Tex. 1983). When the clauses are read together, the intent of the
parties was for "said land" to refer to land subject to this lease. Because the Perry Tract was released
from the lease, it was no longer land subject to the lease. As such, the phrase "said land" does not
refer to the Perry Tract. 

 Moore cites Mathews v. Sun Oil Co. for the proposition that, when an oil and gas lease covers
land consisting of multiple tracts, production on one tract will operate to perpetuate the lease as to
all tracts. 425 S.W.2d 330, 333 (Tex. 1968). The present case, though, is distinguishable. While
the lease in dispute covers multiple tracts, the only tracts on which there was production have been
previously released from the lease. 

 In addition, Moore cites Ridge Oil Co. for the proposition that an oil and gas lease does not
terminate when there are multiple operators under a lease and there is production by only one
operator. 148 S.W.3d at 149-50. As discussed above, the Texas Supreme Court in Ridge Oil
ultimately held production on the Ridge Tract did not hold the Guinn Tract. Id. at 153. We note the
Texas Supreme Court did hold, when there are multiple operators under a lease and there is
production by only one operator, the production holds the lease. Id. However, this holding required
both the nonproducing operator and the producing operator to be assignees of the same lease. That
is not the situation we have in this case. In this case, the evidence shows the producing operator was
a lessee under a different lease. 

 Finally, Moore argues the lease has been pooled. Moore, though, has not directed this Court
to where there is evidence of pooling of the Rudd Tract. Moore argues "production from the Haddad
No. 1 Lease, which had been pooled with the acreage in the N.B. Perry Survey held his lease as
shown by the Pooling Declaration and Agreement in the record." The record citations merely show
that the Perry Tract was pooled. The fact that land which has been released from the lease has been
pooled does not hold the lease. The record does not contain any evidence that any tracts which have
not been released from the lease have been pooled with producing tracts. Moore's third point of error
is overruled.

IV. The Doctrine of Implied Temporary Cessation Does Not Apply

 In the alternative, Moore claims the implied temporary cessation doctrine precludes
termination. Under the implied temporary cessation doctrine, a temporary cessation of production
will not cause the lease to terminate and the lessee is entitled to a reasonable time in which to remedy
the defect and resume production. See Midwest Oil Corp. v. Winsauer, 159 Tex. 560, 323 S.W.2d
944, 946 (1959). The implied temporary cessation doctrine does not apply when a lease contains "a
provision in the habendum clause which expresses a time limitation within which continued drilling
or reworking operations must be conducted." Holt, 984 S.W.2d at 281-82; Samano v. Sun Oil Co.,
621 S.W.2d 580, 581-84 (Tex. 1981); Ridenour v. Herrington, 47 S.W.3d 117, 120 (Tex.
App.--Waco 2001, pet. denied).

 Because the lease at issue contained explicit language limiting the cessation of production
to a specific time period, the doctrine of implied temporary cessation does not apply.

V. Moore Is Not Entitled to Forty Acres Around Each Well

 In his fifth point of error, Moore claims he is entitled to forty acres around each of the two
wells. The lease provides:

 9. In case of cancellation or termination of this lease from any cause, Lessee
shall have the right to retain, under the terms hereof, around each well producing,
being worked on, or drilling hereunder, the number of acres in the form allocated to
each such well under spacing and proration rules issued by Texas Railroad
Commission of the State of Texas, or any other State or Federal authority having
control of such matters; or, in the absence of such rulings; forty (40) acres around
each such well in as near a square form as practicable, and in the event lessor
considers that operations are not being conducted in compliance with this contract,
lessee shall be notified in writing of the facts relied upon as constituting a breach
hereof and lessee shall have sixty (60) days after receipt of such notice to comply
with the obligations imposed by virtue of this instrument. 


Moore argues "[i]t is uncontraverted [sic] that Appellant was producing two wells on his lease at the
time Appellees gave him notice that his lease had 'expired in accordance with its terms'" and claims
he is entitled to retain forty acres around each well. 

 Moore argues, in a lease terminated due to nonproduction, there were producing wells. The
key to this argument is that Moore defines a different date of termination than Jet Stream. If the
lease terminated due to nonproduction, Moore assumes termination occurred when he received the
notice of termination. Two wells were producing at the time Moore received the notice of
termination sent by Jet Stream. Jet Stream asserts the date of termination was thirty days after the
production ceased. (5) 

 The Texas Supreme Court and this Court have both held a lease, after the primary term has
expired, automatically terminates after production is ceased. Watson v. Rochmill, 137 Tex. 565, 155
S.W.2d 783, 784 (1941) ("It appears to be very well settled that under the terms of the lease, upon
cessation of production after termination of the primary term, the lease automatically terminated.");
Fuller v. Rainbow Res., Inc., 744 S.W.2d 232, 234 (Tex. App.--Texarkana 1987, no writ); see Pool,
124 S.W.3d at 203 ("under the automatic termination rule, without a savings clause, cessation of
production in the secondary term automatically terminates the lease, even if profitable production
is later restored"); Waggoner & Zeller Oil Co. v. Deike, 508 S.W.2d 163, 166 (Tex. Civ.
App.--Austin 1974, writ ref'd n.r.e.). Production of oil or gas constitutes a special limitation on the
determinable fee transferred. Id. at 166. If drilling operations are not commenced within the
specified time, the lease automatically terminates. Id. Because there is nothing a lessee could do
to correct or begin to correct the breach of a special limitation, any notice provision does not apply. 
Id. The lease automatically terminated when production was not resumed within the specified time,
and notice of termination was not required. At the time the lease automatically terminated, there
were no producing wells. (6) As such, the clause does not apply. Moore's fifth point of error is
overruled.

VI. The Trial Court Erred In Issuing an Injunction Prohibiting Moore From Recovering
His Equipment


 In his sixth point of error, Moore argues the trial court erred in denying Moore's motion for
summary judgment seeking recovery of his equipment still on the land, including the well casings. 
Moore had brought a counterclaim seeking a declaratory judgment that he had the right to remove
his equipment, including the casings. Jet Stream failed to respond to this counterclaim in either his
motion for partial summary judgment or in the brief in support thereof. After granting Jet Stream's
motion for partial summary judgment and denying Moore's motion for summary judgment, the trial
court set the case for trial. 

 In his answer and counterclaim, Moore pled that, in the event the lease terminated, he had
"the right at any time during or after the expiration of this Lease to remove all property and fixtures
placed by lessee on said land, including the right to draw and remove all casing on the property." 
This issue was not disposed by the partial summary judgment. Although not listed among the issues
set for trial, the record indicates the trial was intended to resolve all remaining issues. (7) Moore was
afforded the opportunity to present evidence at the trial, and Jet Stream cross-examined Moore
concerning his testimony. Neither party argues the trial court's judgment was not final or complains
that this issue was not among those set for trial. The final judgment disposes of all parties and all
claims. A judgment that disposes of all parties and all claims is final and appealable. Lehmann v.
Har-Con Corp., 39 S.W.3d 191 (Tex. 2001). The trial court's judgment is a final, appealable order. 

 At the hearing, Moore testified that the value of "all the equipment and casing" for the well
sites would be approximately $100,000.00. In its final judgment, the trial court issued a permanent
injunction enjoining Moore from "taking any action to interfere with the current status of the wells
. . . including specifically taking any action to remove equipment from the wells or otherwise
changing the current status of the well pending further order of this court." 

 Jet Stream argues Moore is currently in possession of the fixtures, the issue is not ripe, and
a party cannot appeal the denial of a summary judgment. First, there is no evidence in the record
concerning who is in possession of the equipment. Second, Jet Stream fails to cite any authority for
the proposition the issue is not ripe for adjudication and as such the issue of ripeness is inadequately
briefed. See Tex. R. App. P. 38.1(h). Thus, the only argument advanced by Jet Stream that merits
attention is whether an appellant can appeal the denial of a motion for summary judgment. 

 Where a motion for summary judgment is denied by the trial court and the case is tried on
its merits, the order denying the summary judgment cannot be reviewed on appeal. Ackermann v.
Vordenbaum, 403 S.W.2d 362, 365 (Tex. 1966); Williams v. Colthurst, No. 11-06-00103-CV, 2008
Tex. App. LEXIS 2365 (Tex. App.--Eastland Apr. 3, 2008, no pet. h.); Cleaver v. Cundiff, 203
S.W.3d 373, 379 (Tex. App.--Eastland 2006, pet. denied); Anderton v. Schindler, 154 S.W.3d 928,
931 (Tex. App.--Dallas 2005, no pet.); see Valencia v. Garza, 765 S.W.2d 893 (Tex. App.--San
Antonio 1989, no writ). Because Moore cannot appeal the denial of his summary judgment motion,
we will, in the interest of justice, interpret Moore's sixth point of error as challenging the trial court's
permanent injunction.

 The lease in this case provides the "[l]essee shall have the right at any time during or after
the expiration of this lease to remove all property and fixtures placed by lessee on said land,
including the right to draw and remove all casings." An operator has an implied right to remove
leasehold equipment "within a reasonable time of the expiration of the lease, even in the absence of
a specific provision authorizing such removal." McCormick v. Krueger, 593 S.W.2d 729, 731 (Tex.
Civ. App.--Houston [1st Dist.] 1979, writ ref'd n.r.e.); cf. Exxon Corp. v. Pluff, 94 S.W.3d 22, 30
(Tex. App.--Tyler 2002, pet. denied) (no implied duty to remove equipment). Leasehold equipment
is considered personal property. See id.; Meers v. Frick-Reid Supply Corp., 127 S.W.2d 493, 496
(Tex. Civ. App.--Amarillo 1939, writ dism'd); Orfic Gasoline Prod. Co. v. Herring, 273 S.W. 944,
945 (Tex. Civ. App.--Waco 1925, no writ). We note, though, the lessee does not have the right to
remove the well casing if the well is producing or the removal would damage the well. See Patton
v. Rogers, 417 S.W.2d 470, 478 (Tex. Civ. App.--San Antonio 1967, writ ref'd n.r.e.) ("an owner
has no right to remove casing from a producing oil and gas well"); Eubank v. Twin Mountain Oil
Corp., 406 S.W.2d 789, 791 (Tex. Civ. App.--Eastland 1966, writ ref'd n.r.e.). "Where the owner
of the casing is precluded by the principle of equity . . . from removing the casings from a well
producing or capable of producing products in paying quantities, he is, nevertheless, entitled to just
compensation measured by the value of such casing in place less the cost of removing the same." 
Fike v. Riddle, 677 S.W.2d 722, 727 (Tex. App.--Tyler 1984, no writ). 

 Moore had the right to recover his equipment except the well casing. Moore was also entitled
to the value of the well casing less the cost of removal. Moore testified that the value of "all of the
equipment and casing" for the well sites would be approximately $100,000.00. This is some
evidence of the total value of all of the equipment and the well casing. However, the record contains
no evidence of the cost of removing the well casing. Because it was Moore's burden to introduce
evidence of both the value of the well casing and the cost of its removal, the trial court did not err
in failing to enter a finding of damages for the casing. Except for the well casing, the trial court
erred in enjoining Moore from removing his equipment from the lease property. 

VII. The Trial Court Did Not Err in Awarding Gross Revenue

 In his seventh point of error, Moore argues the trial court erred when it awarded Jet Stream
damages measured by the gross revenue from oil sales after Moore resumed production in 2005. 
Moore argues his extraction of the oil was permissive and, alternatively, in good faith. 

 According to Moore, the extraction of oil after the lease terminated was permissive. Moore
cites Natural Gas Pipeline v. Pool, 30 S.W.3d 618 (Tex. App.--Amarillo 2000), rev'd on other
grounds, 124 S.W.3d 188 (Tex. 2003), as authority. If an entry is permissive, there is no trespass. 
Id. Silence, though, is not permission. Id. The evidence in this case conclusively established the
extraction was not permissive. Jet Stream challenged Moore's right to extract the oil shortly after
production resumed.

 Moore also argues he acted in good faith. Whether a producer's actions are in good faith
affects the method by which damages are measured. If a producer trespasses in good faith, the
measure of damages is the value of the minerals minus drilling and operating costs. Mayfield v.
De Benavides, 693 S.W.2d 500, 506 (Tex. App.--San Antonio 1985, writ ref'd n.r.e.). However,
the measure of damages for bad-faith trespass is "'the value of the things mined at the time of
severance without making deduction for the cost of labor and other expenses incurred in committing
the wrongful act . . . or for any value he may have added to the mineral by his labor.'" Id. (quoting
Cage Bros. v. Whiteman, 139 Tex. 522, 163 S.W.2d 638, 642 (1942)). "When one enters into
possession of land and makes improvements thereon with full knowledge of the pendency of an
action to enforce an adverse claim to the premises, one is conclusively considered a trespasser in bad
faith." Id. at 504; see Houston Prod. Co. v. Mecom Oil Co., 62 S.W.2d 75 (Tex. Comm'n App.
1933); NRG Exploration v. Rauch, 905 S.W.2d 405, 410 (Tex. App.--Austin 1995, writ denied). 
But see Byrom v. Pendley, 717 S.W.2d 602, 604 (Tex. 1986) (no bad-faith trespass when cotenant
leases mineral rights). It is uncontested that Moore extracted the oil with full knowledge of an
adverse claim. (8) The trial court did not err in concluding Moore's trespass was in bad faith and in
awarding damages based on gross revenue.

VIII. The Evidence Supporting the Award for Underpayment of Royalties Is Sufficient

 In his last point of error, Moore argues the only evidence concerning the underpayment of
royalties is hearsay and the evidence is insufficient. (9) At trial, William L. Rudd, III, testified he
calculated the underpayment of royalties from a review of the Texas Railroad Commission reports
posted online. Rudd failed to testify how he made these calculations and failed to provide the proper
foundation for the online reports.

 The admission and exclusion of evidence is committed to the trial court's sound discretion;
thus, we review this issue under an abuse of discretion standard. City of Brownsville v. Alvarado,
897 S.W.2d 750, 753 (Tex. 1995). A trial court abuses its discretion when it acts without regard for
any guiding rules or principles. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42
(Tex. 1985). Moore failed to object in the trial court to the evidence. In fact, Moore stated he had
"no objection" to the evidence. Whether the trial court abused its discretion in admitting the hearsay
is not preserved for appellate review. See Tex. R. App. P. 33.1. 

 Even if the evidence is hearsay, we can consider, in an evidentiary sufficiency review,
hearsay evidence admitted without an objection. (10) Wilson, 168 S.W.3d at 812 n.29; see Tex. R.
Evid. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value
merely because it is hearsay."). The test for legal sufficiency is "whether the evidence at trial would
enable reasonable and fair-minded people to reach the verdict under review." Wilson, 168 S.W.3d
at 827. When conducting a factual sufficiency review, a court of appeals can set aside the verdict
only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong
and unjust. Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998); Cain v. Bain, 709
S.W.2d 175, 176 (Tex. 1986). The evidence is more than a scintilla of evidence and the evidence
is not controverted. The evidence is legally and factually sufficient.

Conclusion

 We modify the trial court's judgment to remove the permanent injunction prohibiting Moore
from removing his equipment, with the exception of the well casing, from the lease property. As
modified, we affirm the judgment of the trial court. 




 Jack Carter

 Justice


Date Submitted: May 7, 2008

Date Decided: June 12, 2008
1. Moore states in his summary judgment affidavit that coverage was denied due to insufficient
liquid collateral and the lack of general liability insurance, which he had never been required to
carry. According to Moore, "[i]n essence, I was rejected because I was too small an operator." 
2. Of the numerous copies of the lease introduced into the record, none of the copies contains
a complete legible copy of the statement at issue. This quotation is the product of combining two
incomplete copies of the lease. We emphasize that the parties should make sure the record
accurately reflects the entire document at issue--particularly the clauses being disputed.
3. Moore argues in his brief: "[i]f Appellant is not entitled to defend Appellee's suit under the
force majeure clause as argument in Issue No. 1 above under the theory that he was diligent in
meeting the financial assurance requirements of the Railroad Commission, then he is entitled to a
trial on that issue." Moore concludes the argument with the assertion that "[i]f his diligence is an
issue, Appellant should be able to try this issue and summary judgment should be deemed
inappropriate because of this fact." If Moore is raising the issue of due diligence in the context of
a defense other than the force-majeure clause, Moore's brief fails to specify what defense is being
argued. To the extent this argument can be interpreted as raising a defense other than the force-majeure clause, the argument is inadequately briefed. See Tex. R. App. P. 38.1(h). Further, Moore
has failed to preserve any other defenses by raising them in the trial court. See Tex. R. App. P. 33.1.
4. The record contains a release dated April 1, 1952, from Phillips Petroleum Company in
which Phillips surrenders all interest in the Perry Tract. The parties have not directed us to where
the record contains evidence of how Phillips obtained its interest under the lease. To the extent the
best evidence rule would require the introduction of the writing proving Phillips' interest, Moore
waived any error by failing to object in the trial court. See Tex. R. App. P. 33.1; Tex. R. Evid. 1002. 
Moore did not introduce any evidence contradicting Rudd's testimony.
5. We note paragraph 5 of the lease contains two specific time limits: a thirty-day provision
and a sixty-day provision. Jet Stream argues the thirty-day limit applies. This opinion should not
be interpreted as holding the thirty-day provision applies to the facts of this case. It is not necessary
for us to decide which specific time limit applies because it is uncontested that production ceased
for more than sixty days. 
6. We note the Beaumont Court of Appeals has construed a similar provision and awarded the
lessee forty acres around each producing well. Hunt Oil Co. v. Dishman, 352 S.W.2d 760 (Tex. Civ.
App.--Beaumont 1961, writ ref'd n.r.e.). Hunt Oil, though, is clearly distinguishable from the
current case. In Hunt Oil, the lease was not terminated for lack of production and there were wells
producing when the lease terminated. Id.
7. Jet Stream did not object when Moore presented evidence concerning the value of the
oilfield equipment. In its brief, Jet Stream alleges this issue was set for trial on the merits. 
8. We note Moore extracted the oil pursuant to a temporary injunction. Because a temporary
injunction is to maintain the status quo and not to adjudicate a case on the merits, a party cannot rely
on the temporary injunction as evidence of good faith. Rauch, 905 S.W.2d at 410. Moore could
have ceased production to avoid liability for bad-faith trespass. "Repudiation of a lease by a lessor
relieves the lessee from any obligation to conduct any operation on the land in order to maintain the
lease in force while a judicial resolution of the controversy between the lessee and lessor over the
validity of the lease is pending." Exploracion De La Estrella Soloataria Incorporacion v. Birdwell,
858 S.W.2d 549, 554 (Tex. App.--Eastland 1993, no writ). Moore decided, however, to continue
protection.
9. Although the record contains evidence that Moore accepted the reduced royalty payments
and Moore complains that Jet Stream failed to introduce any of the division orders, Moore does not
argue on appeal that Jet Stream is estopped from collecting underpayment of royalties. Moore's
complaint on appeal is limited to challenging the evidence introduced by Jet Stream.
10. We note the Texas Supreme Court has stated, "[i]t has long been the rule in Texas that
incompetent evidence is legally insufficient to support a judgment, even if admitted without
objection." City of Keller v. Wilson, 168 S.W.3d 802, 812 & n.29 (Tex. 2005). Moore does not
argue the evidence was incompetent.